## HELEN WITORT v. CHICAGO & NORTH WESTERN RAILWAY COMPANY.[1]

March 18, 1927.

No. 25,861.

**Question for jury whether decedent was engaged in interstate commerce.**

1. It was error to direct a verdict for defendant, for the deposition of one of defendant's employes, introduced by plaintiff, made it a jury question whether plaintiff's decedent at the time he met death was engaged in interstate commerce.

**Judicial discretion abused.**

2. And under the facts stated in the opinion there was an abuse of judicial discretion in refusing to permit plaintiff, surprised by the testimony given by defendant's yardmaster, when called as a witness by plaintiff, wholly at variance with that given in a prior deposition, to call the witness' attention to such variance.

Appeal and Error, 4 C. J. p. 824 n. 65.
Master and Servant, 39 C. J. p. 1111 n. 43.
Witnesses, 40 Cyc. p. 2560 n. 67.

Plaintiff appealed from an order of the district court for Ramsey county, McNally, J., denying her motion for a new trial. Reversed and new trial granted.

*Miner & McDonald*, for appellant.
*Brown, Somsen & Sawyer*, for respondent.

HOLT, J.

Action to recover for the death of defendant's employe, while engaged in interstate traffic, alleged to have been caused by its negligence. A verdict was directed in favor of defendant. From the order denying a new trial plaintiff appeals.

The evidence made it an issue for the jury to determine whether defendant's negligence was the proximate cause of the death of

[1]Reported in 212 N. W. 944.

Stephen Witort, plaintiff's intestate. Contributory negligence of deceased did not appear as a matter of law. Hence, the only ground upon which the directed verdict stands is that there was not sufficient evidence warranting the jury in finding that deceased was engaged in interstate traffic when he met death; for if he then was in intrastate traffic the workmen's compensation law of Illinois, where the accident occurred, was the sole remedy.

Defendant, a railroad engaged in intra and interstate transportation, has extensive freight yards at Proviso, a suburb of Chicago, Illinois. Witort was a car inspector in yard No. 3, where he was killed. As such, he also made light repairs on cars found defective, being repairs that could be made without placing the car on the repair track or in the shop. At the westerly end of yard No. 3, there was a lead coming from the west and passing in a southeasterly direction. From this lead 23 tracks branched off towards the east to another lead. These tracks were long enough to accommodate a train haul of 75 or more cars. Beginning from the north the tracks were known as 0, 00, 1 to 21. Tracks 1, 2 and 3 were for incoming trains to be broken up and its cars distributed on other tracks, depending on destination or intended use.

On the morning of August 24, 1925, the yardmaster was informed that an empty car, tagged O. K. for a grain car, on track 9 which was the track where cars destined for the American Can Company, a nearby industry, were placed, had a coupler knuckle on the east end thereof out of repair. The switch crew took it out of track 9 and set it in on track 12. The yardmaster then directed that this car be sent in on track 4, and asked Witort to repair it. It was placed as directed and Witort went to the switch shanty, located near the switch for track No. 9, to get the necessary parts and tools and proceeded to the east end of the car to replace a part of the defective coupler. While he was getting his tools the switch crew went in on track 3 to break up a train that had come in and pulled out a string of cars, some of which were marked for track 4. The latter were pushed or shunted in on the last named track against the car on the east end of which Witort was working. He was

struck down and instantly killed, his body being dragged several carlengths.

The depositions of the yardmaster and members of the switching crew were taken by plaintiff; but defendant brought these witnesses to the trial, except Grode, the car marker, so their depositions could not be used and plaintiff was dependent on them for proof. The yardmaster was first called by plaintiff, and it soon became apparent that his testimony would not tend to show that the car on which Witort was working when killed was then in interstate commerce. Plaintiff claimed surprise and asked permission to inquire as to testimony given in his deposition at variance with that given on the witness stand. The request was refused and questions ruled out on the ground that plaintiff could neither lead nor impeach her own witness. And counsel for defendant, to forestall the claim of surprise as to other witnesses present whose depositions had been taken, then advised plaintiff that defendant had them in the courtroom, and she was free to ascertain from them what they could and would testify to before placing them on the witness stand. This the plaintiff declined to do, stating that she would assume they would testify the same as in their depositions; but when they were placed on the stand their testimony accorded with that given by the yardmaster, and no better success met her efforts to call to their attention what they had deposed wholly at variance with what they were testifying to.

Plaintiff placed in evidence the deposition of Grode, the marker of the switch crew, who passed along the trains to be broken up and by a chalk mark on the cars thereof designated the track on which they were to be placed, taking into account how each car was tagged as to condition, destination, and whether empty or loaded. Certain of the tracks were for specific uses. His testimony was that on the day in question track 4 was the Iowa track. When asked what he meant by the Iowa track his answer was: "Cars destined for points in the State of Iowa." To the question, "What was track 4 designated for?" he answered, "Ordinarily it would be Iowa dead freight cars." He also testified that at no time that morning did he go down track 4 and mark any car thereon for any other track;

and that it was customary for inspectors to make light repairs without placing the car on the repair track and without flagging the same. The yardmaster's testimony on the stand, while not denying that cars assembled on track 4 that day were destined for Iowa, continually qualified his answers to the effect that at any time before the locomotive for the road haul coupled to the train when fully made up, he would have pulled out empty O. K. grain cars had he received orders for such cars from the nearby industries, although he admitted there was a standing order to send such cars to Iowa and he had received no order prior to the accident to send any such cars elsewhere. It seems to us this with Grode's deposition, read in evidence, comes very near making it a jury question whether or not the car Witort was set to repair was not at the time of the accident in interstate commerce, namely, whether it had not already been designated as part of a train then being made up for transportation into Iowa.

We recognize the law to be that, if by placing this car on track 4 its destination to Iowa was not thereby definitely determined but the alternative remained that it might be diverted to intrastate traffic, Witort was not within the protection of the federal act. Philadelphia & Read. Ry. Co. v. Cannon (C. C. A.) 296 F. 302. But, if the car was definitely set in on track 4 to make up a train then being assembled for transportation into Iowa, it was already in interstate traffic when Witort was set to work thereon. That it was empty does not signify to the contrary, for just such cars were to be sent to Iowa to be loaded. North Car. R. Co. v. Zachary, 232 U. S. 248, 34 Sup. Ct. 305, 58 L. ed. 591, Ann. Cas. 1914C, 159. One of the cars shunted in on track 4 against the car on which Witort was working was a loaded coal car admittedly bound for Iowa, though the yardmaster on the stand claimed it to have gone in by mistake. Seaboard Air Line Ry. Co. v. Koennecke, 239 U. S. 352, 36 Sup. Ct. 126, 60 L. ed. 324; Philadelphia & Read. Ry. Co. v. Hancock, 253 U. S. 284, 40 Sup. Ct. 512, 64 L. ed. 907; Philadelphia & Read. Ry. Co. v. Polk, 256 U. S. 332, 41 Sup. Ct. 518, 65 L. ed. 958; Pennsylvania Co. v. Donat, 239 U. S. 50, 36 Sup. Ct. 4, 60 L. ed. 139;

Hester v. East Tenn. & W. N. C. R. Co. (C. C. A.) 254 F. 787. The purpose of the work controls. Louisville & Nashville R. Co. v. Parker, 242 U. S. 13, 37 Sup. Ct. 4, 61 L. ed. 119. If the purpose of the yardmaster who had the designation of the cars to be assembled in a train haul was to have this car in the train then being made up on track 4 destined for Iowa, Witort was engaged in interstate traffic.

Had the yardmaster's testimony on the witness stand been the same as that given in his deposition it seems clear that the court could not have directed a verdict, for when plaintiff was refused permission to lead, or in any way remind the witness of what he had deposed, she offered to prove that he therein testified, among other things, as follows:

"Q. What were your duties as yardmaster that day? A. Why, I was making up or breaking up trains in the yard. Q. Does it make up and break up any particular trains in yard 3? A. It just breaks up transfer trains that come from other yards and makes up trains for the west. Q. What was track 4 being used for on this day? A. To classify Iowa cars, Iowa empties. Q. By that do you mean empties going to Iowa, empty cars going to Iowa? A. Yes, sir. Q. Did you have anything to do with the classification or designation of cars, certain cars placed on various tracks? A. Yes, sir, I had the say of all cars that were classified in yard 3. Q. What cars did you order Norris [foreman of the switch crew] to put in on track 4 that day? A. All Iowa dead freight cars going to Iowa. Q. Were there any other cars placed on this track before Norris' crew placed any cars on this track that were going to Iowa? A. There was Iowa cars on the track when I came to work that morning. Q. So that prior to your coming to work, there were Iowa cars on the track already? A. Yes, sir. Q. And when was the makeup of the train complete, when would it be complete so that you would send a train out from track 4? A. I do not remember at the time. We used cars off of that track to fill other time freight trains out of there. * * * Q. What was your object in ordering this car to be placed on track 4?

A.  Because the car would go to Iowa then, used grain cars, in Iowa.  Q.  This defective car?  A.  Yes, sir.  Q.  Well, was it your intention to have this car move to Iowa with the Iowa train after it was repaired?  A.  Yes, sir.  Q.  Did you have any [other] reason for placing this car on track 4, to be repaired?  A.  No, sir, the only reason, after it was repaired, it would go to Iowa.  Q.  Were you going to repair this car and then send it to the American Can Company?  A.  No, sir.  Q.  What time would that train be made up on track 4 leaving for Iowa?  A.  Why, we had no special time for these dead freight trains.  If we have tonnage trains, why, we order a train to take them out.  Q.  What kind or what class of freight, or cars, were ordered placed on track 4 that day?  A.  Iowa dead freight.  Q.  At the time of the accident where were all the cars that were on track 4 going to?  A.  Iowa.  Q.  That means Clinton, Iowa?  A.  Yes, sir.  Q.  Now, if cars were going to points beyond Clinton, Iowa, what tracks would you place them on?  A.  Track 4."

It is perfectly clear that, if the yardmaster had testified on the stand as he had deposed, the conclusion would have been inevitable that Witort when killed was working on a car then in interstate traffic.  And putting it mildly, plaintiff must have been taken by surprise when the yardmaster on the witness stand took evident care to convey the idea that although cars placed on track 4 were so-called Iowa cars they were subject all the time to be sent to nearby industries, and were not definitely assembled for a train destined for Iowa until coupled to a line haul locomotive.  Neither could he be prevailed on to say that trains formed on track 4 were destined to go farther than East Clinton in Illinois, a division point, although in the deposition he freely stated such trains would go to Clinton, Iowa, and farther west.

The trial court could plainly see that the witness was unfriendly to plaintiff.  He was in defendant's employ and was produced by defendant.  It, of course, was also apparent that plaintiff was almost compelled to use the yardmaster as a witness to prove the interstate traffic character of the car which Witort was working on.  He

was the one who made up trains. It is true, that it is left to the trial court's discretion when and how far a party, who has produced a witness and been surprised by his testimony, may be permitted to treat the witness as hostile and permit leading questions and explanation in respect to prior depositions. But we are of the opinion that here plaintiff was held too strictly to rules pertaining to the examination of a witness produced by her, and that judicial discretion was not exercised properly. When a party has been surprised by wholly unexpected testimony of a hostile witness, leading questions or cross-examination should be permitted and some means afforded for an explanation of why the party placed himself in the predicament of having produced a witness who has defeated the cause of action or the defense, as the case may be. State v. Johnson, 12 Minn. 378 (476); Selover v. Bryant, 54 Minn. 434, 56 N. W. 58, 21 L. R. A. 418, 40 Am. St. 349; Lindquist v. Dickson, 98 Minn. 369, 107 N. W. 958, 6 L. R. A. (N. S.) 729, 8 Ann. Cas. 1024; State v. Shea, 148 Minn. 368, 182 N. W. 445; Hickory v. U. S. 151 U. S. 303, 14 Sup. Ct. 334, 38 L. ed. 170.

The order is reversed and a new trial granted.