# HERBERT CECIL HIEDEMAN v. RUSSELL. HIEDEMAN AND OTHERS.

187 N. W. (2d) 119.

May 7, 1971—No. 42071.

*Rufer, Hefte, Pemberton & Schulze, James L. Schulze,* and *Solberg, Anderson & Stewart,* for appellant.

*Winter, Lundquist & Sherwood,* for respondents Hiedeman and Peterson.

*Field, Arvesen, Donoho, Lundeen & Hoff,* for respondent Otter Tail Power Company.

Heard before Knutson, C. J., and Murphy, Otis, Kelly, and Odden, JJ.

MURPHY, JUSTICE.

Appeal from an order of the district court denying plaintiff's motion for an order vacating the jury verdict and ordering a new trial.

While laying a corrugated metal roof, plaintiff sustained serious injuries when a piece of the material came into contact with an overhead powerline. The jury found that neither the owners of the property nor the power company was at fault. Numerous errors are asserted, including the claim that the verdict is not supported by the record, errors in the charge to the jury and errors relating to the admissibility of evidence.

It appears that plaintiff, Herbert Cecil Hiedeman, is the younger brother of defendant Russell Hiedeman. Russell and his partner, Robert Peterson, who are the individual defendants, operated a farm on which they proposed to build a machine shed. Plaintiff, who also operated a farm in the same area, had been employed in construction work and knew something about the construction of the type of building the individual defendants proposed to erect.

In April 1967 plaintiff visited the Hiedeman and Peterson farm and volunteered to assist in the construction of the building. These men had assisted each other in various kinds of work

in the past. When plaintiff arrived at the farm to begin work, he noticed that the individual defendants had dug some holes in preparation for the structure. Plaintiff objected to the construction in that precise location for the reason that it would be too close to the high-voltage powerlines running directly overhead. These powerlines were owned and operated by defendant Otter Tail Power Company. It is clear from the record that all three men were fully aware of the presence of the powerlines, knew of the danger they presented, and acted accordingly. The site of the building was moved further south in compliance with plaintiff's wishes. Defendant Peterson testified that they tried to keep the structure "at least two or three feet to the south of the high lines." Although the powerline involved was readily obvious to view, it would appear that plaintiff and the two individual defendants did not feel that it presented a danger that could not be avoided by proper care, and no action was taken to notify Otter Tail of their activity or to request the company to shut off the power running through the line during the process of construction.

After about 3 to 5 days of working on the building, plaintiff began installing the corrugated metal roof. This material came in strips 11 feet long and about 26 inches wide. In the process of performing this work, defendant Peterson would hand the metal sheets to plaintiff who would lay them in place. While plaintiff was working on the lower end of the roof, defendant Peterson handed him a strip 11 feet long but half the normal width. It would appear that the metal sheet had to be turned around to place it in position. As this was being done, it somehow made contact with the overhead powerline, causing the injuries which plaintiff sustained. There was some suggestion that a gust of wind could have caught the sheet and blown it upwards. Plaintiff had no recollection of what happened after he took the sheet from Peterson. He saw a "big ball of light" and then found himself on the ground bleeding. Defendant Hiedeman saw nothing of the accident. Later in the trial plaintiff testified that he did

recollect that Peterson had handed him the last sheet "wrong end to," thus requiring him to turn the sheet around for proper placing. Plaintiff admitted that he never told Peterson about which way he should hand the sheets to him. He also testified that he was fully aware of the danger presented by the power-line, always tried to keep the sheets low, and at the time of the accident he probably was so engrossed in his work that he forgot about the line. The powerline involved was about 23 feet above the ground. The building was 10 to 12 feet high. Plaintiff testified that the powerline nearest to the building was 12 to 14 feet away.

By special verdict the jury found that Otter Tail was not negligent; that defendants Russell Hiedeman and Robert Peterson were not negligent; and that plaintiff was not negligent, but that he had assumed the risk of his own injury. The court then ordered judgment for defendants and dismissed plaintiff's cause of action with prejudice. Plaintiff's motion for a new trial was denied.

It should be noted that the action was originally started by plaintiff and his dependents against the two individual defendants. The theory of the complaint was that the defendants had breached their duty to plaintiff who, at the time the injuries were sustained, was a "business visitor." Defendants, by third-party complaint, joined Otter Tail, contending that the injuries resulted from the careless and negligent design and installation of the transmission line. Thereafter, plaintiff amended his complaint and joined all of the defendants, making the same allegation of fault against Otter Tail as defendants had done.

■ We can find in the record little of substance to support plaintiff's claim that the individual defendants breached their duty to him as a "business visitor." It is not clear from the record what the details of the business relationships were. The action apparently is brought upon the theory that defendants are subject to a "premises liability" with respect to the maintenance of the premises in favor of those invited thereon for some social

or economic purpose. In discussing the obligation owed by the possessor of land to the business visitor, we said in Mourning v. Interlachen Country Club, 280 Minn. 94, 100, 158 N. W. (2d) 244, 249:

"There is only one particular in which one who holds his land open for the reception of business visitors is under a greater duty in respect to its physical condition than a possessor who holds his land open to the visits of a gratuitous licensee. The possessor has no financial interest in the entry of a gratuitous licensee; and, therefore, such a licensee is entitled to expect nothing more than an honest disclosure of the dangers which are known to the possessor. A business visitor, however, is entitled to expect that the possessor will take reasonable care to discover the actual condition of the premises and either make them safe or warn him of dangerous conditions. See, Restatement, Torts, § 343, *comment a*; Strong v. Shefveland [249 Minn. 59, 81 N. W. (2d) 247]; Thayer v. Silker, 267 Minn. 268, 126 N. W. (2d) 263."

According to Restatement, Torts, § 332:

"A business visitor is a person who is invited or permitted to enter or remain on land in the possession of another for a purpose directly or indirectly connected with business dealings between them."

See, also, Dowd v. Portsmouth Hospital, 105 N. H. 53, 193 A. (2d) 788, 95 A. L. R. (2d) 986; Prosser, *Business Visitors and Invitees*, 26 Minn. L. Rev. 573.

The trial court in his instructions fully and fairly stated the law with reference to the obligation of the owner of premises to a business visitor. We assume that plaintiff agreed that the jury was correctly instructed on this point since he made no objections and suggested no modifications. It is clear from the facts already stated that, in the context of the record and the theory upon which the action was brought, the verdict of the jury that the individual defendants were not negligent must be sustained.

■ We are further persuaded that the trial court was correct

in its determination that the record supports the verdict of the jury in favor of Otter Tail. We fail to find any evidence which would support a verdict to the contrary. There was no inherent danger to plaintiff or to the public because of the structure and location of the powerline. It had existed there for many years. The power company had no knowledge or reason to anticipate that an occupant of land over which the powerline extended would construct a building in such close proximity to it that the line would present a hazard during the construction of the building. It is apparent that plaintiff and defendants did not consider the location of the powerline to present a danger or that a request to shut off the current during construction was necessary. The evidence was to the effect that the National Electrical Safety Code issued by the United States Bureau of Standards established a standard of 20.2 feet for powerline clearance. The line in the present instance was 23 feet above the ground. The court instructed the jury that—

"* * * compliance with the various standards set forth in the Code, is prima facie evidence that such compliance is the approved method of constructing and maintaining electric transmission lines."

On the basis of the record, it seems to us that our statement in Anderson v. Northern States Power Co. 236 Minn. 196, 202, 52 N. W. (2d) 434, 439, is controlling. We there said:

"Here, there was no reason to anticipate that anyone would come in contact with the wires as they existed prior to the erection of the new building. It could hardly be said that defendant should have anticipated that the owners of the premises would proceed to build a new structure directly under its wires and in close proximity thereto without first giving defendant an opportunity to move the wires or otherwise protect workmen from injury. Where a line has been safe until it is made dangerous by the act of a third party which could not reasonably have been anticipated by the distributor of electricity, negligence cannot

be predicated upon the failure to make such line safe from the changes brought about by the action of such third party, in the absence of notice to the one responsibile for the maintenance of the line. See, Mirnek v. West Penn Power Co. 279 Pa. 188, 123 A. 769."

■ Plaintiff suggests that the trial court's instructions with reference to the negligence of defendant Otter Tail, particularly those bearing upon the elements of foreseeability and intervening and superseding cause, were prejudicial and misleading.[1]

---

[1] On these elements the trial court instructed the jury: "Now in respect to the defendant Otter Tail Power Company, it appears without question from the evidence, and it is admitted by all the parties, that Otter Tail Power Company had no actual notice that this machine shed was being constructed in proximity to the transmission line, nor is it claimed that Otter Tail Power Company should have discovered the construction of this building in the short time that elapsed between the start of construction and the time of the accident.

"Therefore, before you could find defendant Otter Tail Power Company negligent in this case, you would have to determine from all the evidence that the defendant Otter Tail Power Company should have reasonably anticipated or foreseen that this machine shed or similar building would be constructed in such proximity and that the construction would reasonably create unreasonable hazard to persons working on such construction.

"If such danger or hazard under all circumstances should reasonably have been anticipated or foreseen, then a failure to guard against such danger may be negligence, even though the particular injury which did occur could not have been reasonably foreseen."

The jury was further instructed: "I have mentioned the words, superseding cause. I will given you a definition of what superseding cause is. A cause is not a direct cause when there is a superseding cause. For a cause to be a superseding cause, all of the following elements must be present: First, its harmful effect must have occurred after the original negligent act; secondly it must not have been brought about by the original negligent actor; three it must actively work to bring about a result which would not otherwise have followed from the original negligence and four it must not have been reasonably foreseeable by the original negligent actors. Thus if you find from the evidence that there

How these instructions were misleading or prejudicial is not clearly articulated in his briefs and argument. We dispose of this claim by observing that when the charge is viewed in its entirety from a practical and commonsense point of view, in light of the record as a whole, as we are required to do (Cameron v. Evans, 241 Minn. 200, 62 N. W. [2d] 793), we are unable to find substance to support the claim of prejudicial error.

■ We have carefully reviewed the record as it relates to plaintiff's claim that the trial court erred in sustaining objections to expert testimony with reference to custom and usage with respect to the construction of electrical powerlines. We are satisfied that the trial court was correct in its view that these inquiries related to hypothetical situations entirely irrelevant to the record and that there was no error in closing off this line of inquiry. In any event, the exclusion of evidence for immateriality or lack of foundation rests primarily in the discretion of the trial court. Independent School Dist. No. 24 v. Weinmann, 243 Minn. 469, 68 N. W. (2d) 248. We have repeatedly held that questions of materiality and relevancy of evidence rest largely in the discretion of the trial court, and its determination must control unless practical justice requires otherwise. Meemken v. O'Hara, 243 Minn. 138, 66 N. W. (2d) 601; Fulsom v. Egner, 248 Minn. 156, 79 N. W. (2d) 25; State, by Clark, v. Wolkoff, 250 Minn. 504, 85 N. W. (2d) 401.

Plaintiff's further contention that the trial court erred in instructing the jury on the subject of assumption of risk may be disposed of by the observation that, since the jury found all parties free of negligence, the issue of assumption of risk became moot.

Affirmed.

---

was an intervening cause in respect to the conduct of one or more of the parties, then even though that party were negligent, if there was an intervening cause, such negligence would not be the direct cause of the particular accident."