**Eleanor COLBY, as Special Administratrix of the Estate of Earl William Nesler, Deceased, Appellant,**

v.

**William M. GIBBONS, Trustee of the Property of Chicago, Rock Island and Pacific Railroad Company, Debtor, Respondent.**

No. 47970.

Supreme Court of Minnesota.

Feb. 9, 1979.

Rehearing Denied March 13, 1979.

Rerat Law Firm and John C. Boylan, Minneapolis, for appellant.

Stringer, Donnelly, Courtney, Cowie & Rohleder and Charles A. Flinn, Jr., St. Paul, for respondent.

Heard before ROGOSHESKE, KELLY, and YETKA, JJ., and considered and decided by the court en banc.

YETKA, Justice.

This action is brought under the Federal Employers' Liability Act (FELA), 45 U.S. C.A., §§ 51–60, to recover damages sustained as a result of the injury and death of Earl W. Nesler, a carman employed by the Chicago, Rock Island and Pacific Railroad Company (Railroad). The matter was tried in Freeborn County District Court. By special verdict the jury found that the Railroad and Nesler were each 50 percent negligent and that Nesler's widow and four children had sustained damages of $152,000. Plaintiff, the special administratrix of Nesler's estate, appealed from the order denying her motion for amended verdict or, in the alternative, for a new trial and from the judgment entered June 6, 1977.

On appeal, plaintiff challenges the trial court's rulings on the admissibility of certain proffered testimony,[1] jury instructions, and the basis of the jury award. The issues raised are:

1. Did the trial court improperly deny plaintiff the opportunity to lead and impeach an adverse party's employee whom plaintiff called as a witness? Did the witness' testimony contradict his former statement?

2. Was it proper for the trial court to exclude evidence of the custom and practice of railroad employees' use of blue signals prior to 1975?

3. Did the trial court properly exclude the yardmaster's statement that he forgot to tell the west end crew of Nesler's presence on track 21?

4. Did the trial court improperly emphasize contributory negligence in its instructions to the jury?

5. Was the special verdict asking for the amount of damages, reduced to present value, erroneous in light of the other special verdicts and instructions?

6. Was it proper for the trial court to limit testimony concerning Nesler's familial relationship to the period of 6 weeks prior to the accident?

We reverse in part and affirm as to damages and remand for a new trial on the issue of liability alone.

On the evening of August 7, 1975, Roy White, yardmaster of the Rock Island switchyards in Des Moines, Iowa, directed the switching crew working on the east end or east lead track of the switchyard to take the cars on track 21 and to put them onto a train that was being assembled on track 4. The third car on track 21 failed to couple because the knuckle of the coupler was missing. The foreman reported the defective coupler to the yardmaster, who later radioed the east end switching crew and instructed them to pick up the carman who was bringing a knuckle and proceed to track 21 to repair the defective coupler. The carman, Earl Nesler, along with the four-man switching crew, proceeded to track 21.

Before commencing the repairs, and contrary to Rule 26 of the Uniform Code of Operating Rules,[2] Nesler failed to place blue flags or blue lights at the ends of the car on which he was working, thus failing to warn others not to place equipment on the same track. Neither did he have radio contact with the men at the other end of his track so that he could notify them that he was making the repairs. Holding the knuckle in both hands, Nesler stood directly in front of the coupler while Leland Dingman, the switching crew foreman, held up the pin lifter from the left side and Carl White, a switchman, assisted from the right

[1] The trial in the instant case took place prior to the effective date of the Minnesota Rules of Evidence (effective July 1, 1977).

[2] The rule provides: "A blue signal displayed at one or both ends of an engine, car or train, indicates that workmen are under or about it; when thus protected it must not be coupled to or moved. Each class of workmen will display the blue signals and only these same workmen are authorized to remove them. Other equipment must not be placed on the same track so as to intercept the view of the blue signals, without first notifying the workmen."

side. While Nesler and the two members of the east lead switching crew were repairing the broken coupler at the eastern end of the string of cars on track 21, Thomas Fox, the field switchman, and the switching crew working the west lead moved twelve cars onto track 21 from the west end. The cars were switched onto track 21 on the yardmaster's instructions. Just as Nesler got the knuckle in place, the cars on track 21 were struck by the cars being shunted into place by the west lead crew. He was trapped between the engine and the car on which he had been working and sustained multiple injuries that led to his death.

1. It is not disputed that Nesler failed to display blue flags or blue lights at the ends of the car although such warnings were required by Rule 26 of the Uniform Code of Operating Rules. Plaintiff sought to introduce evidence showing that Nesler's failure to post the signals did not constitute negligence because the carmen customarily relied on the yardmaster for protection.

On August 23, 1975, Fox, the field switchman, had given a signed statement acknowledging that blue locks are used on the rip tracks, but that he could not remember their being used in the yard. When plaintiff called Fox at trial, he testified that the blue signals were used "off and on." Plaintiff claims this response surprised her and that the trial court abused its discretion by denying plaintiff the right to lead and impeach the witness.

■ In order for a party to impeach his own witness, he cannot merely be disappointed by the response of the witness, see, *State v. Guy*, 259 Minn. 67, 105 N.W.2d 892 (1960); he must be genuinely surprised, see, *State v. Saporen*, 205 Minn. 358, 285 N.W. 898 (1939). It is within the trial court's discretion to determine whether a party who is surprised by a witness' testimony may impeach or cross-examine the witness,

and this depends on the extent of the inconsistency. See, *Skinner v. Neubauer*, 246 Minn. 291, 296, 74 N.W.2d 656, 660 (1956). Before this court will reverse a trial court's determination, there must be a clear abuse of discretion by the trial court. See, *Wild v. Rarig*, 302 Minn. 419, 453, 234 N.W.2d 775, 796 (1975), certiorari denied, 424 U.S. 945, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976).

■ To support her contention that she should be allowed to impeach the switchman, plaintiff cites *Witort v. Chicago & North Western Railway*, 170 Minn. 482, 212 N.W. 944 (1927). The facts there were similar to those in the instant case, although the issue was whether the car decedent was repairing was intended for interstate or intrastate use. The yardmaster's testimony on that issue differed from his prior statement, and the trial court did not allow plaintiff to impeach him as a hostile witness. That determination was later overturned as an abuse of discretion. It was clear that if the yardmaster had testified consistently with his prior statement, the inevitable conclusion would have been that the car being repaired was bound for interstate use. Other important factors were that it was obvious from the testimony that the witness was unfriendly to the plaintiff; the yardmaster's testimony was crucial; and plaintiff was almost compelled to use the yardmaster as a witness. 170 Minn. 487, 212 N.W. 946. *Witort v. Chicago & North Western Railway* is distinguishable from the instant case for several reasons. First, Fox's testimony did not directly contradict his earlier statement; second, there was no indication that Fox was unfriendly towards the plaintiff; third, Fox's testimony was not crucial to the outcome of the case; and finally, plaintiff was not compelled to call Fox since there was ample testimony from other employees about the custom and practice of using blue signals.[3]

---

3. Carl White testified that at times he saw the blue signals being used during repairs, sometimes not; Leland Dingman stated that it is in the province of the carmen to use or not to use the blue flags or blue locks in the yard; and Harl Deaton, railroad engineer, admitted that he has seen the blue flags, blue locks, or blue lights used in the yard at times. Moreover, Dingman testified that the east lead switch crew did not have an "understanding" with the west lead switch crew as was required when engines are being worked on at both ends of a

We feel that the degree of inconsistency in this case was not such that plaintiff should have been permitted to impeach the witness. As the trial court concluded, the August 23 statement is "equivocal" whereas "the testimony is somewhat more positive and is in direct answer to an unequivocal question by plaintiff's attorney." Allowing plaintiff to impeach the witness would have added evidence only cumulative to that given by others. Consequently the trial court did not abuse its discretion by denying plaintiff the opportunity to impeach Fox.[4]

2. In 1969, Wallace Kipper was injured in the same yard while putting a coupler on a car on track 21. He had not used the blue signals but had instead relied on the yardmaster for protection. Plaintiff sought to elicit testimony from Kipper about the custom and practice of the railroad employees' use of blue signals in 1969 and to reveal the circumstances of Kipper's injury in order to show that by 1975 the Railroad knew of the practice and of the attendant dangers. The trial court, however, refused to allow any testimony about activities antedating 1975, finding the circumstances too remote and irrelevant.

Rulings on the admissibility of evidence are left to the sound discretion of the trial court, *Henwood v. Chaney*, 156 F.2d 392, 396 (8 Cir.) (applying this rule in FELA case), certiorari denied, 329 U.S. 760, 67 S.Ct. 113, 91 L.Ed. 655 (1946), and its determination controls "unless practical justice requires otherwise," *Hiedeman v. Hiedeman*, 290 Minn. 210, 217, 187 N.W.2d 119, 124 (1971). As we have previously recognized,

"When and under what circumstances evidence may or may not be received in the face of an objection as to remoteness or relevancy rests in the discretion of the trial court and is not grounds for reversal

or a new trial unless it clearly appears that there has been an abuse of that discretion." *Renne v. Gustafson*, 292 Minn. 218, 223, 194 N.W.2d 267, 270 (1972).

In the instant case, the trial court properly excluded Kipper's testimony concerning the carmen's custom and practice in the use of blue lights and blue flags during the years 1969 to 1975. After his injury in 1969, Kipper convalesced for more than 2 years and upon returning to work was moved from the yard. His duties were different from those of carmen such as Nesler. Kipper no longer had occasion to use the blue signals, and he testified that he had no direct knowledge of the custom and practice concerning the use of the signals by carmen in 1975. However, Kipper's lack of knowledge about the use of signals during those years is not a proper basis for excluding his testimony about the custom and practice in 1969 and earlier. Plaintiff wanted to use Mr. Kipper's testimony for two purposes: to show the custom and practice of the carmen's use of the blue flags, and to show that the railroad knew of the resulting danger. Fifty years ago, in *Witort v. Chicago & North Western Railway* there was testimony that carmen traditionally made light repairs without moving the faulty cars to the repair track or flagging the cars. 170 Minn. 485, 212 N.W. 945. Kipper would have testified that similar practices in 1969 led to his accident. Although he could not testify regarding the use of blue signals after his accident, there was ample testimony on this issue by other witnesses. The testimony could have led a jury to conclude that the practice had existed for decades, or at least since 1969, that the Railroad knew of it, was aware of the dangers, and did nothing to change the custom, and, therefore, that the Railroad alone was at fault.

---

track. (Uniform Code of Operating Rules 103A). There was no understanding because they relied on the yardmaster for protection; that was the custom and practice.

4. Plaintiff also argues that she should have been permitted to impeach the witness under Rule 43.02, of the Rules of Civil Procedure. That provision allows a party to "call an adverse party of his * * * employee * * * and interrogate him by leading questions and contradict and impeach him on material matters in all respects as if he had been called by the adverse party." It appears, however, that plaintiff did not properly manifest her intent at trial to impeach Fox under this rule.

Evidence is relevant if it "logically tends to prove or disprove a material fact in issue." *Boland v. Morrill*, 270 Minn. 86, 99, 132 N.W.2d 711, 719 (1965). If the circumstances of Kipper's injury are similar to those of Nesler's injury, the evidence is relevant to the issue whether the Railroad is liable. See, *Independent School District No. 181, Brainerd v. Celotex Corp.*, 309 Minn. 310, 313, 244 N.W.2d 264, 266 (1976). As this court recognizes:

> "* * * The prevailing rule in a majority of jurisdictions is that evidence as to similar accidents suffered by others under similar circumstances at times not too remote from the accident involved in the litigation is admissible to show the dangerous character of the place of injury or that defendant had notice or knowledge of the dangers attendant upon the maintenance of the place of injury. See, Annotation, 70 A.L.R.(2d) 170. As a foundation for such evidence, it must appear that the circumstances surrounding the other accidents were substantially the same as those involved in the accident in litigation, and in most jurisdictions the determination of this question is left to the trial court. The decisions of this court are in conformity with the general rule." *Haukom v. Chicago Great Western Ry.*, 269 Minn. 542, 555, 132 N.W.2d 271, 279 (1964).

Thus, in the instant case, justice compels that the plaintiff be afforded the opportunity to present evidence and testimony concerning past use of the blue signals and the circumstances of Kipper's injury. Because we believe that the testimony was an essential element in proving the plaintiff's case and the time period is not too remote, it was prejudicial error to exclude the testimony.

3. Shortly after the accident, yardmaster Roy White was questioned by Brenton, a railroad official, in the presence of Richard Rummelhart. White told Brenton that he (White) had been busy talking on the phone to Kansas City and had forgotten to tell the west end crew that Nesler and the east end crew were on track 21. The trial court did not allow Rummelhart to testify about this statement because it was deemed hearsay. Plaintiff contends the testimony should have been permitted because White's statement was either an admission or part of the res gestae.

Whether the statement constituted an admission or both an admission and part of the res gestae need not be decided, for we feel the res gestae concept is dispositive. Under the res gestae rule, a spontaneous utterance forming part of a transaction and spoken in response to nervous stimulation caused by the transaction is admissible. This exception to the hearsay rule is founded on the belief that the impact of the circumstances eliminates the intention and opportunity to fabricate and is a reasonable substitute for an oath. See, e. g., *Fenton v. Minneapolis Street Ry.*, 252 Minn. 75, 82, 89 N.W.2d 404, 410 (1958).

Defense counsel contends that White's statement is not part of the res gestae because it was given 20 to 30 minutes after the accident[5] and, therefore, was not spontaneous. Long ago this court recognized that—

> "It is evident that whether the declaration is directly connected with, and growing out of, the main fact, does not depend on the time which has elapsed between them, though it must always be an important element in the consideration of the question; a considerable time may elapse, and yet the declaration be a part of the res gestae. It may be made immediately upon the fact, and the circumstances be such as to exclude it. Each case must depend on its own peculiar circumstances, and be determined by the exercise of sound judicial discretion." *O'Connor v. Chicago, Milwaukee & St. Paul Ry.*, 27 Minn. 166, 173, 6 N.W. 481, 484 (1880).

---

5. Daniel Middour, a locomotive engineer, estimated that an hour to an hour and a half passed from the time the east end crew radioed to stop putting cars on track 21 until the conversation with Brenton. However, both parties ignore the discrepancies between the two witnesses' testimonies and rely on the half-hour estimate. For this reason, we assume the half-hour time period is accurate.

Thus, "[t]ime is an important but not definitely controlling consideration." *Meyer v. Travelers Insurance Co.*, 130 Minn. 242, 244, 153 N.W. 523, 524 (1915).

*Hyvonen v. Hector Iron Co.*, 103 Minn. 331, 115 N.W. 167 (1908), is analogous to the present case. In *Hyvonen* an engineer at a mining company was in charge of lowering a skip into a mining shaft. While descending, the skip dropped, and the miners who were riding on it were injured. Shortly after being raised to the top, two or three of the men asked the engineer what had happened. He made statements that suggested he had been at fault. These declarations were made about 20 to 25 minutes after the skip and within 5 minutes after the men arrived at the surface. The court ruled that the statements were admissible either as res gestae or admissions. 103 Minn. 332, 115 N.W. 168. This ruling was based on several factors: the general results of the engineer's act were not known until the men came to the surface and spoke with him; he had been on duty at the time; there was excitement; the statements were made to the injured men; and the statements were made at the place of the disputed negligent act. Similarly, White's statement was made less than half an hour after he became aware of Nesler's injury; there was still so much excitement that the men were allowed to go home early; White gave the statement to a railroad authority directly concerned with the incident; and the act was done and the

statement was made within the scope of White's employment. Further, this court adopted a liberal policy of allowing statements that are claimed to be part of the res gestae into evidence. See, *Jacobs v. Village of Buhl*, 199 Minn. 572, 583, 273 N.W. 245, 250 (1937).

White, in his statement made during the excitement following the accident, indicated that he had been at fault and that he was responsible for Nesler's injuries. His comments manifested the indicia of trustworthiness upon which the res gestae exception is based. From the facts of this case, it is difficult for us to see how such a statement, made by White to his superior while the pieces of the accident were still being put together and while the injured workman's fate was still unknown, could not have been part of the res gestae. Consequently, it was prejudicial error to exclude the statement.

4. Plaintiff asserts that the trial court's jury instructions unduly emphasized contributory negligence, conveying "the erroneous impression that Earl Nesler was to be held to a higher standard of care than the railroad." After carefully reviewing the record as a whole and putting the statements in the context from which they were taken, we feel that the trial court presented balanced instructions and, in fact, relied on a recognized authority as a basis for part of the instructions.[6]

6. Plaintiff noted that the erroneous impression conveyed by the jury instructions was at least partly attributable to the court's having repeated that the railroad is not an insurer or guarantor of the employees' safety. However, in the first instance in which the words were used, the trial court was merely explaining defendant's duty under law. In the second instance the words were used as a preface to defining the standard of care imposed on the defendant. The court instructed that "[a]lthough the defendant is not the insurer or guarantor of the safety of its employees and is not liable on the basis of hindsight, the defendant had the duty to exercise reasonable care to provide the plaintiff with a reasonably safe place to work." Furthermore, the statement comports with the jury instructions found in Devitt & Blackmar, 3 Federal Jury Practice and

Instructions, 3rd Ed., § 94.10. This section reads: "It was the continuing duty of the defendant, as an employer, at the time and place in question, to use ordinary care under the circumstances, in furnishing the plaintiff with a reasonably safe place in which to work, and to use ordinary care under the circumstances to maintain and keep such place of work in a reasonably safe condition. This does not mean, of course, that the employer is a guarantor or insurer of the safety of the place to work. The extent of the employer's duty is to exercise ordinary care, under the circumstances, to see that the place in which the work is to be performed is reasonably safe, under the circumstances shown by the evidence in the case." The challenge made here is not only without merit, but the instructions comport with prescribed standards.

Furthermore, plaintiff did not make a timely objection to the court's instructions. As a general matter, a party must object to jury instructions before the jury retires. Rule 51, Rules of Civil Procedure. Upon the conclusion of the jury instructions, the trial court asked counsel if they noted "any omissions or inadvertent statements of the Court." Both counsel responded in the negative. Having voiced no opposition to the instructions before the jury was sequestered, plaintiff cannot now be heard. See, e. g., *Schirra v. Delaware, L & W.R.*, 103 F.Supp. 812 (M.D.Pa.1952); *Kindt v. Yellow Cab of Winona, Inc.*, 300 Minn. 190, 218 N.W.2d 459 (1974).

5. Plaintiff argues that a general verdict should have been submitted to the jury and that, the special verdict awarding damages to the decedent's family was confusing to the jury in light of the other instructions and led to an inadequate award.

We find that the instructions as a whole were clear and that the trial court, within its broad discretion, properly relied on the use of a special verdict. See, Rule 49.01, Rules of Civil Procedure; 2 Youngquist & Blacik, Minnesota Rules Practice 483. Similarly, the amount of the damages was not inadequate. The jury could have considered, used, discarded, or modified various factors in awarding the $152,000. In light of the fact that Nesler was 50 years old at the time of his death, was earning between $10,000 and $15,000 a year, and could have been expected to live another 15 years, the award was reasonable, and the damage portion of the verdict will stand.

6. Plaintiff argues that the trial court's restriction of testimony regarding decedent's familial relationship to the last 6 weeks before his death unduly limited proof of damages. Decedent and his wife had been separated for 5 years; 6 weeks before Nesler's death, there was a reconciliation. The trial court ruled that testimony on the family situation would be permitted only as it related to the 6 weeks prior to the accident and that evidence about decedent's financial contributions during the separation was irrelevant.

The admissibility of evidence is within the discretion of the trial court, *E. C. I. Corp. v. G. G. C. Co.*, 306 Minn. 433, 437, 237 N.W.2d 627, 630 (1976), and the trial court's determination of remoteness and relevancy will be overturned only if there has been an abuse of discretion, *Renne v. Gustafson*, 292 Minn. 218, 223, 194 N.W.2d 267, 270 (1972).

Here, the trial court sought to protect the plaintiff against possible undue prejudice by preventing the jury from learning of the prior marital difficulties. Any evidence of past discord could have caused the jury to speculate about Nesler's future contributions to the family. Since there had been a reconciliation, it was not an abuse of discretion for the trial court to exclude potentially prejudicial and nonprobative evidence.

The case is reversed and remanded for a new trial on the issue of liability alone.