**Karen TATE, Respondent,**

v.

**SCANLAN INTERNATIONAL, INC., Appellant.**

**No. C0–86–1159.**

Court of Appeals of Minnesota.

April 7, 1987.

Review Denied May 28, 1987.

Robert J. Tansey, Jr., Kathleen A. Marron, Robins, Zelle, Larson & Kaplan, Minneapolis, for respondent.

Steven R. Anderson, Lori A. Wagner, Faegre & Benson, Minneapolis, for appellant.

Heard, considered and decided by PARKER, P.J., and HUSPENI and FORSBERG, JJ.

## OPINION

FORSBERG, Judge.

This case arises from respondent Karen Tate's action against Scanlan International for damages as a result of Scanlan's use of Tate's unpatented idea for a surgical supply product. Tate's claims were for breach of express or implied contract, unjust enrichment, conversion and breach of confidence. A jury trial resulted in a verdict for Tate in the amount of $520,313.

Scanlan moved for judgment notwithstanding the verdict (jnov) or for a new trial and sought a reduction of prejudgment interest awarded respondent. The trial court denied the jnov and new trial motions and partially reduced the award of

prejudgment interest. We affirm in part and reverse in part.

## FACTS

Respondent has been an operating room nurse at the University of Minnesota for the past 19 years. In 1978 she came up with an idea to solve a common problem experienced by operating room nurses working with Prolene suture which, although possessing great tensile strength, was extremely delicate and often broke when clamped in place during surgery. Nurses had developed a practice of cutting pieces of catheter tubing to fit over the ends of the clamps to allow for a firm grip while protecting the suture from damage. Yet, this method was time consuming, the pieces of tubing were uneven and were not radiopaque (capable of being seen under x-ray), and it was difficult to keep track of the number of pieces cut, making mandatory accounting of operating room supplies difficult. Respondent's idea was to have available pre-cut uniform shods or tips to put on the ends of the clamps. The tips would be accessible, easily accountable, radiopaque, sterile, and able to hold the suture.

In September of 1979, respondent contacted Timothy Scanlan, president of appellant Scanlan International, a designer and marketer of surgical supplies. Respondent set up a meeting with Scanlan to present her idea, with the understanding that he would keep her idea confidential and that if he used her idea, she would be compensated. At the meeting, respondent explained the problem of working with the Prolene suture. She brought a "Kittner" sponge holder to illustrate a possible method for achieving some of the characteristics of the product she envisioned. The Kittner holder is a foam block with holes which secures the sponges until use, but allows them to be extracted with only one hand holding a clamp. With Kittners, nurses can determine from the number of empty holes in the block how many sponges are still in a patient's body.

Scanlan later wrote respondent that he liked her idea and that the company was going to look into it, including a package of "Tip-Guards" as an example after which they might model the proposed product. Tip-Guards, manufactured by appellant, were unsterilized, uniform plastic tips sold in bulk, and used to protect the ends of surgical instruments.

After their initial meeting, and over the course of the next two years, respondent was kept apprised of developments of the product by Scanlan, who consulted with her on various aspects of the design of the prototype such as color, number per package, and serrated vs. non-serrated surface ridges. Respondent gave Scanlan a list of potential customers.

In April of 1980, respondent and Scanlan met again, at which time respondent inquired as to her compensation. Scanlan told respondent that she would make money when the company made money, but no definite terms were discussed.

In February of 1981, respondent and Scanlan met to examine prototypes prepared by appellant. Respondent approved of the design of the prototype, and Scanlan told her that his company planned to sell a box of the products called "Suture Boots" for about $6.00 and that she would receive about $.35 per box, which would have been slightly less than six percent of gross sales.

When Suture Boots hit the market in May of 1981, each package contained one foam block which held ten plastic tips. The block had an adhesive strip on the bottom, and its entire contents were sterile. On June 22, 1981, appellant sent respondent two contract proposals. The first contract proposed payment of a royalty of 5% of appellant's net profit on Suture Boots for five years. Net profit was $2.00 per box. The alternative proposal was the immediate and final payment of $3,000. These proposals were revoked by letter dated July 7, 1981, before respondent had an opportunity to respond to either of them.

Appellant revoked the offers after learning from its patent attorney that the foam holder from the Kittner sponges that respondent had brought to the first meeting with Scanlan, and which had been incorporated into Suture Boots, had been previous-

ly patented (the Chapel patent). Appellant consequently revoked its contract proposals to respondent, and by letter dated September 2, 1981, presented her with a new proposal. The new proposal offered respondent $1,000 for her time and help plus a commission on any sales by her to customers. Respondent did not respond to this offer, and instead instituted this action against Scanlan International.

Appellant subsequently entered into a licensing agreement with the patent holder, Surgicott, to permit the use of the block in Suture Boots. This agreement required appellant to pay Surgicott a royalty of slightly more than 2% of gross sales.

At trial, testimony from patent attorneys was conflicting on the issue of whether Suture Boots actually infringed on the Chapel patent. Testimony revealed that appellant had previously investigated the idea of using plastic tips over the ends of clamps to aid in grasping suture. In the 1970's, Timothy Scanlan and Dr. Jose Ernesto Molina had unsuccessfully experimented with permanently affixing plastic to clamp jaws. Dr. Molina and Dr. Walton Lillehei testified that prior to May of 1981, there was no product on the market designed to handle the suture without damage or slippage.

On the question of respondent's damages, in addition to testimony relating to previous offers by Scanlan to Tate and Scanlan's license agreement with Surgicott, Thomas McGoldrick, a medical marketing expert, testified that a reasonable royalty for a "niche" product such as Suture Boots would be 30% of sales. McGoldrick's determination was based on an analysis of actual profit and profit objective for Suture Boots, the need for and risk involved in marketing the product, and possible competition. McGoldrick acknowledged that 30% was high, but noted that the 60% net profit appellant made on the product was very high for the medical field. John Heinmiller, an accountant, testified that sales of Suture Boots would increase 4.5 percent per year for the next five years.

The case was submitted to the jury by special verdict. The jury found respondent's idea was novel and concrete; that her idea was not covered by a patent; that respondent communicated her idea to appellant with the understanding that the idea would be kept confidential were it not used; that appellant expressly or impliedly agreed to compensate respondent if it profitably marketed a product using her idea; and that appellant breached its agreement with respondent. The jury awarded Tate $245,033 for the use of her idea up to the time of trial, and $275,280 in future damages.

Appellant moved for judgment notwithstanding the verdict and for a new trial, and sought an order reducing the amount of prejudgment interest as claimed in respondent's notice of taxation of costs and disbursements. The trial court denied appellant's motions, but reduced prejudgment interest for the period of September 17, 1985 through April 13, 1986, based on a continuance granted to respondent in September. Appellant appeals from the trial court's denial of its motions. Respondent appeals from the reduction of prejudgment interest.

### ISSUES

I. Was the evidence sufficient to support the jury's findings:

    A. that respondent's idea was novel;

    B. that respondent's idea was concrete;

    C. that 30% of the net profit on sales of Suture Boots was a reasonable royalty?

II. Did the trial court err in submitting the issue of future damages to the jury?

III. Did the trial court err in deducting prejudgment interest from September 17, 1985 through April 13, 1986?

### ANALYSIS

■ Granting judgment notwithstanding the verdict is proper only if the evidence when viewed in the light most favorable to the verdict is practically conclusive against the verdict and reasonable minds can reach only one conclusion. *Nadeau v. County of Ramsey*, 277 N.W.2d 520, 522 (Minn.1979).

A new trial should not be granted unless the verdict is so contrary to the preponderance of the evidence as to imply that the jury failed to consider all the evidence or acted under some mistake or from some improper motive, bias, feeling or caprice, instead of honestly and dispassionately exercising its judgment. *LaValle v. Aqualand Pool Co., Inc.*, 257 N.W.2d 324, 328 (Minn.1977).

## I.

■ Generally, abstract ideas are not protectable property interests. In order for an abstract idea to be the subject of an express or implied contract or to be otherwise protected by the law, it must be novel and concrete. *Shanco Int'l, Ltd. v. Digital Controls, Inc.*, 312 S.E.2d 150, 153 (Ga.Ct. App.1983); *Smith v. Recrion Corp.*, 541 P.2d 663, 665 (Nev.1975); *Downey v. Gen'l Foods Corp.*, 31 N.Y.2d 56, 334 N.Y.S.2d 874, 876, 286 N.E.2d 257, 259 (1972). Appellant argues that respondent's idea was neither novel nor concrete, and that the evidence was insufficient to support these findings by the jury.

### A. *Novelty.*

■ A novel idea is an original idea, something that is not already known or in use. *Wilson v. Barton & Ludwig, Inc.*, 163 Ga.App. 721, 296 S.E.2d 74, 77 (1982). The novelty essential to a protected property right cannot arise solely from the fact that something already known and in use is put to a new use. *Id.* In order for the aggregation of known elements to satisfy the novelty requirement, their conjunction must contribute something, that is, the whole must exceed the sum of its parts. *Greening Nursery Co. v. J. and R. Tool and Manufacturing Co.*, 376 F.2d 738, 740 (8th Cir.1967).

Appellant asserts that respondent's idea is an obvious combination of previously developed products (Tip Guards, and the Kittner Sponge foam block), and is therefore not novel and not subject to legal protection. This argument requires an analogy to patent cases, in which the question of novelty often hinges on whether the subject of the patent is obvious.

■ The test for determining obviousness, or anticipation precluding patentability of an idea is whether the prior art discloses all elements of the claimed combinations, or their mechanical equivalents, functioning in substantially the same way, to produce the same result. *Greening Nursery Co.*, 376 F.2d at 740. The linchpin in this analysis is not whether the individual components of the patent were obvious at the time of the invention, but whether the aggregation produced a new or different result or achieved a synergistic effect. *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 708 F.2d 151, 155 (5th Cir. 1983); *Square Liner 360°, Inc. v. Chisum*, 691 F.2d 362, 369 (8th Cir.1982). In answering this question, secondary considerations tending toward a showing of nonobviousness include commercial success of the product, copying, long felt but unsolved need, and failure of others. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966); *Square Liner*, 691 F.2d at 369.

Here, there was no dispute that respondent did not design any of the individual elements of Suture Boots. However, respondent's idea was for a *system* to assist operating room nurses in firmly handling delicate suture. The need for such a product was evidenced by the prior dissatisfaction with the method of cutting catheter tubing to shod clamps. Evidence showed that prior experimentation into a method for achieving such a system had been unsuccessful, and that Suture Boots was a commercially successful product, despite copies which had emerged on the market.

■ The question of novelty is a question of fact for the jury and it is not a question upon which there is likely to be uniformity of thought in every given factual context. *Belt v. Hamilton Nat'l Bank*, 108 F.Supp. 689, 692 (D.C.Cir.1952). Here, the jury found that respondent's idea was novel. This conclusion finds much support in the evidence and will not be disturbed.

### B. *Concreteness.*

■ Concreteness of an idea pertains to the requisite developmental stage of the idea when it is presented. *Smith v. Recrion Corp.*, 91 Nev. 666, 541 P.2d 663, 665 (1975). An idea is a protectable property interest, if it is sufficiently developed to be ready for immediate use without additional embellishment. *Id.* If an idea requires extensive investigation, research, and planning before it is ripe for implementation, it is not concrete. *Id.*

■ Appellant argues that since the key to Suture Boots as a new product was the foam block, and respondent admitted she provided only an example, expecting appellant to develop a suitable holder, the idea was not sufficiently developed so as to be usable, and was therefore not concrete.

The evidence here showed that respondent developed an idea for a system of elements, using something like the Kittner foam block to hold plastic, radiopaque, sterile tips to fit on the ends of clamps and provide strength and sensitivity in a convenient, efficient way. Respondent orally presented her specific idea to Scanlan, demonstrating the elements of the product and its goal. Respondent expected Scanlan to develop the idea further—by producing the parts of the product as she had specified. With respondent's help, Scanlan researched the idea and produced just what respondent had ordered in Suture Boots.

Oral presentations and demonstrations of ideas and written proposals of ideas have been held to be sufficiently developed to be "usable," and thus satisfy the concreteness requirement. *See Bergman v. Electrolux Corp.*, 558 F.Supp. 1351 (D.Nev.1983) (salesman's oral presentation of idea was sufficiently concrete to create a jury question); *Galanis v. Procter and Gamble Corp.*, 153 F.Supp. 34 (S.D.N.Y.1957) (plaintiff's letter describing idea about a new detergent combining two other products and called "Blue" was sufficiently concrete to create a jury question); *Belt*, 108 F.Supp. 689 (oral presentation of radio program sufficiently concrete); *Liggett & Meyers Tobacco Co. v. Meyers*, 101 Ind. App. 420, 194 N.E. 206 (1935) (plaintiff's letter describing idea for a new advertisement sufficiently concrete); *see also Dewey v. American Stair Glide Corp.*, 557 S.W.2d 643 (Mo.Ct.App.1977) (plaintiff's drawing and nonworkable mock-up were sufficiently concrete).

The undisputed testimony of Mr. McGoldrick was that "concrete" in the field of medical marketing meant that the concept was very well defined, with reasonable access to all parts necessary to develop it. He also testified that in this field a working model of an idea was rarely presented. A review of the evidence adduced at trial shows that there was more than adequate support for the jury's determination that respondent's idea was usable and was concrete.

### C. *Reasonable Royalty.*

■ Appellant argues that the jury's award of 30% of the net profit as a reasonable royalty is unreasonable, excessive, and not supported by the evidence. In patent cases, a reasonable royalty is determined by applying the "willing buyer-willing seller" test. *Medtronic v. Catalyst Research Corp.*, 547 F.Supp. 401, 414 (D.Minn.1982). This test measures what two free and uncoerced bargainers would have agreed upon as of the date when infringement began, and takes into account anticipated, as well as actual, profits. *Id.* at 414. A number of other factors may be considered in determining a reasonable royalty:

1. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

2. The existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or conveyed sales.

3. The established profitability of the product made under the patent; its commercial success; and its current popularity.

4. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

5. The nature of the patented invention; the character of the commercial embodi-

ment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

6. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

7. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

8. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process business risks, or significant features or improvements added by the infringer.

9. The opinion testimony of qualified experts.

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970), *modified*, 446 F.2d 295 (2d Cir.), *cert. denied*, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971).

■ The evidence on this issue included previous offers by appellant to respondent, detailed negotiations between the parties, and the licensing agreement between appellant and Surgicott (2% of net profit for use of patented foam block). In addition, Mr. McGoldrick testified that in this case, a reasonable royalty would be 30%. McGoldrick's undisputed testimony revealed that he arrived at this figure through consideration of actual profits and profitability, popularity and the portion of the selling price customary in the industry. McGoldrick stated that 30% was somewhat high, but not in relation to the unusually high 60% net profit realized by Scanlan.

The jury's determination that 30% was a reasonable royalty was based on extensive testimony relating to matters generally considered in such a determination. Thus it had sufficient basis in the evidence, and was not so excessive or unreasonable as to "shock the conscience" of the court or mandate reversal. *See Verhel v. Independent School District No. 709*, 359 N.W.2d 579, 591 (Minn.1984).

## II.

Rulings on the admissibility of evidence are generally left to the discretion of the trial court. *Colby v. Gibbons*, 276 N.W.2d 170, 175 (Minn.1979). The trial court's determinations will control unless there has been a clear abuse of discretion, *Renne v. Gustafson*, 292 Minn. 218, 223, 194 N.W.2d 267, 270 (1972), or practical justice requires otherwise. *Hiedeman v. Hiedeman*, 290 Minn. 210, 217, 187 N.W.2d 119, 124 (1971).

■ Generally, evidence of future damages may be admitted if there is a reasonable basis for their determination. *Pietrzak v. Eggen*, 295 N.W.2d 504, 507 (Minn. 1980). This rule precludes the recovery of damages which are remote, speculative or conjectural. *Id.* However, the law does not require mathematical certainty in the proof of loss, but only proof as to a reasonable certainty. *Leoni v. Bemis Co.*, 255 N.W.2d 824, 826 (Minn.1977).

In this case, in addition to evidence showing continued success and profitability of Suture Boots, evidence pertaining to the issue of future damages included McGoldrick's testimony that a 30% royalty was reasonable and that the expected product life of Suture Boots was at least 10 years; Mr. Heinmiller's testimony that net profit on Suture Boots was a consistent 60%; and that sales had continued to increase over the last five years and had leveled off to a 4.5% increase at the time of trial. Heinmiller and Scanlan testified that five year projections on profits are routinely made in the medical products industry.

■ Appellant argues that the evidence on this issue was too speculative and that McGoldrick's and Heinmiller's interpretations of trends were flawed. However, appellant's proposed analysis of future trends is merely an alternative interpretation of the facts as shown to the jury and analyzed for their benefit by McGoldrick and Heinmiller. The award was based on a showing of future profit. It is well-established that contemplated profit can be recovered even though not established with mathematical precision. *Bryngelson v. Minnesota Valley Breeders*

*Assn.,* 262 Minn. 275, 283, 114 N.W.2d 748, 753 (1962). Lost profits are recoverable if the business or venture upon which anticipated profits are claimed is such as to support an inference of definite profits grounded upon a reasonably sure basis of facts. *Cardinal Consulting Co. v. Circo Resorts,* 297 N.W.2d 260, 266 (Minn.1980). In this case, there was sufficient basis to predict future damages, and the trial court did not err in submitting this issue to the jury.

### III.

■ Minn.Stat. § 549.09, subd. 1(b) (1986) provides in part:

> If either party serves a written offer of settlement, the other party may serve a written acceptance or a written counter-offer within 60 days. After that time interest on the judgment shall be calculated by the judge in the following manner. The prevailing party *shall* receive interest on any judgment from the time the action was commenced or a written settlement demand was made, or as to special damages from the time when special damages were incurred, if later, until the time of verdict or report only if the amount of its offer is closer to the judgment than the amount of the opposing party's offer.

(Emphasis supplied).

Here, the trial court reduced respondent's award of prejudgment interest by deducting interest accumulated from September 17, 1985 to April 13, 1986. The reduction was based on the trial court's belief that respondent should not be entitled to interest during that time period since the delay resulted from respondent's request for a trial date continuance.

Respondent argues that the trial court erred in reducing the prejudgment interest award because the statutory award of interest is mandatory and is therefore not subject to an equitable reduction. Indeed, the language of the statute is mandatory and there is no basis in the case law developed around the statute to support such a reduction. The equity of such a reduction is minimized because appellant was also granted a continuance in this matter. In addition, allowing the full amount of prejudgment interest does not thwart the purpose of the statute, which is to encourage parties to settle.

### DECISION

The evidence was sufficient to support the jury's findings that respondent's idea was novel and concrete and that a reasonable royalty for use of respondent's idea was 30% of the net profit on sales of the product. There was sufficient evidence on which to base an award of future damages and submission of that issue to the jury was not error. No acceptable basis existed for reducing respondent's award of prejudgment interest.

Affirmed in part and reversed in part.