Dale BELCHER and Doris Belcher, formerly known as Doris Little, Appellees,

v.

David L. LITTLE, Appellant.

No. 64986.

Supreme Court of Iowa.

Feb. 17, 1982.

Thomas J. Levis of Scalise, Scism, Gentry, Brick & Brick, Des Moines, for appellant.

John R. Hearn of Hearn & Clauss, Des Moines, for appellees.

Considered by LeGRAND, P. J., and UHLENHOPP, HARRIS, ALLBEE, and LARSON, JJ.

LeGRAND, Justice.

This case is the ten-year aftermath of a divorce between defendant David L. Little and his former wife, Doris Little, who is now Doris Belcher and who, with her present husband, Dale Belcher, brought this action against David for slander of title to real estate. A jury returned a verdict in favor of the Belchers in the amount of $12,432.24. Little appeals and we reverse.

Doris and David were divorced on October 5, 1971. The decree included the following stipulations:

> Real Property: The residence of the parties locally known as 600 Olinda, Des Moines, Iowa, shall become the property of [Doris Little] and [David Little] shall pay $20 per month on the house payment until September 1973 or until [Doris Little's] marriage, whichever event shall first occur. [David Little] shall pay the property taxes on the residence for the parties on or before December 15, 1971.

Doris was represented in the divorce proceedings by Virgil Moore, a Des Moines lawyer. David was unrepresented. The evidence shows that Mr. Moore was to have a quitclaim deed to the above property ready for David's signature at the time the decree was entered. For some reason the matter was not completed at that time. Eight months later David went to Mr. Moore's office and executed a quitclaim deed to the property. By that time, however, David had remarried. His wife did not join in the deed. Mr. Moore delivered the deed to Doris, who kept it for a year before recording it.

Doris married Dale Belcher in 1973, and they improved the Olinda Avenue property from time to time. In 1976, they embarked upon extensive improvements which they expected to finance by mortgaging the property. They made financing arrangements at the South Des Moines National Bank. In connection with their loan application, the Belchers provided the bank with an abstract of title. Although the record does not show how the matter came to the attention of the bank's lawyer, it was apparent the original deed given by David had been altered. Someone had signed the name of Mary J. Little to the deed. Her "signature" was not acknowledged. Accordingly, the bank's lawyer requested a new quitclaim deed from David and his present wife, Mary J. Little.

It is conceded Mary J. Little did not sign the deed. Only three persons had possession of it: David, Doris, and Doris' attorney. David flatly denies having signed his wife's name. It is unlikely that he did because, if he had, Doris' attorney would have refused to accept it. In fact, the record contains no evidence upon which it can be ascertained *who* altered the deed. That is of no importance because this appeal does not depend on the identity of the wrongdoer.

To comply with the bank's request, the Belchers asked David for a new quitclaim deed signed by him and his wife. At first David raised no objection. After confer-

ring with an attorney, however, he claimed an interest in the real estate and refused to sign the deed tendered by the Belchers. David based his claim on the belief, questionable at best, that the original decree was ambiguous as to his ownership in the property.

Doris filed an application asking the Polk County District Court to clarify the provision of the decree relating to real estate. After a hearing at which David appeared, the trial court signed an order designated as a nunc pro tunc order, stating the court's original intent had been to award title to Doris and to divest David of all interest. Despite this nunc pro tunc order, David continued to assert an interest in the property. Unable to obtain a quitclaim deed from David, the Belchers eventually brought this slander of title suit against him with the result already noted.

On this appeal David says he was entitled to a directed verdict; and, failing that, he argues the trial court erred in instructing the jury on the issue of publication, one of the essential elements of the action.

Slander of title actions are rare. Only six reported cases decided by this court have come to our attention. In *Hanson v. Hall Mfg. Co.*, 194 Iowa 1213, 190 N.W. 967 (1922), we listed five elements which must be proven to establish a case of slander of title. They are: 1) the uttering and publication of slanderous words; 2) that they were false; 3) that they were malicious; 4) that plaintiff sustained special damages; and 5) that plaintiff has an estate or interest in the property slandered. *Id.* at 1215, 190 N.W. at 968. This definition was repeated in *Witmer v. Valley Nat'l Bank of Des Moines*, 223 Iowa 671, 673, 273 N.W. 370, 371 (1937). We have also said "slander" may consist of either written or oral statements when speaking of disparagement of title to real estate. *Miller v. First Nat'l Bank*, 220 Iowa 1266, 1270, 264 N.W. 272, 274 (1935).

The dispositive issue here—what constitutes publication when the alleged slanderous statements were made only to the person slandered—is one of first impression in this state and, indeed, there is scant authority on the question elsewhere.

## I. *Directed Verdict.*

David's motion for a directed verdict made at the conclusion of plaintiffs' evidence and renewed when plaintiffs and defendant had both rested, was based on three grounds: failure of proof as to publication; failure of proof as to malice; and absolute privilege. We reserve discussion of the publication issue for Division II, and we reject David's other two grounds. Both malice and privilege were submitted to the jury, and properly so.

■ On the question of privilege, Little argues that the statements objected to were "absolutely privileged" under *Robinson v. Home Fire & Marine Ins. Co.*, 242 Iowa 1120, 1125–30, 49 N.W.2d 521, 524–27 (1951) as having been made during or in preparation for a judicial proceeding. This apparently referred to the Belchers' application for clarification of the divorce decree. The trial court instructed the jury on this affirmative defense. There was substantial evidence that the defamatory statements antedated judicial proceedings. Thus, the issue was properly one for jury determination, and the trial court was right in overruling the motion for directed verdict on this ground.

■ There was also substantial evidence of malice as defined by the trial court, again without objection. This case has a long and acrimonious history. There was evidence Little resented Doris' second husband. There was also evidence Little long recognized he had no interest in the Olinda Avenue real estate. He had made no claim for almost ten years. He had given a quitclaim deed to the property without protest. Only after the property had been substantially improved and was worth much more than when the divorce was granted did Little say he still owned an interest in it. He did so even after the trial court's nunc pro tunc order confirmed title in Doris. Little appealed from that determination, and the Iowa Court of Appeals affirmed the

ruling in an unpublished per curiam opinion dated June 30, 1978. Even this did not dissuade Little from stubbornly asserting his claim of ownership.

Under these circumstances, even taking into consideration the advice Little's attorney gave him, the jury could indeed find as it did—that the statements were made maliciously and not in good faith. The trial court properly overruled the motion for directed verdict on this ground.

## II. *Publication.*

■ The issue upon which this case turns is the question of publication, one of the essential elements of slander of title. Little says there was no publication as a matter of law. This was the third ground for directed verdict motion. Although we agree with the trial court in overruling that motion, we believe Little's related complaint that, even if this was a jury question, the instruction was erroneous, has merit. Because we hold the instruction contained reversible error, Little is entitled to a new trial.

■ As already noted, this case presents a novel problem of first impression. Several general principles come into play in our consideration of this question. First, there can be no slander without a publication of the defamatory statements to someone other than the person defamed. "Publication" merely means a communication of the statement to some third person or persons. *Royston v. Vander Linden,* 197 Iowa 536, 537, 97 N.W. 435, 436 (1924); Restatement (Second) of Torts § 630 (1978). Second, as slander involves damage to reputation, there is no slander as long as only the injured person knows of the statement. Third, the wrongdoer is not ordinarily liable if the injured person repeats the slanderous material or himself communicates it to others. W. Prosser, *Law of Torts* § 113 (4th ed. 1971).

In the present case, Little's statements and those of his attorney were made only to the Belchers. This would not constitute a publication under the general rule. The publication, if there was one, occurred when the Belchers themselves communicated Little's claim to the bank, which in turn allegedly used that as a reason for refusing to lend them money.

This brings us to the deceivingly simple ultimate issue: was the repetition of the defamatory statements by Belchers a publication of the slander? Little says it was not; Belchers say it was; we say it *might* have been but that the jury was not presented the question under correct legal guidelines.

This case is distinguishable from those in which defamatory statements are made to third persons under circumstances where the wrongdoer should have foreseen they would be repeated to other third persons. *Brown v. First Nat'l Bank of Mason City,* 193 N.W.2d 547, 555 (Iowa 1972) (person making slanderous statements to newspaper reporter should anticipate they would be printed); rather, this is a case in which the *damaged person* repeated the slander to a third person.

■ The general rule is that communication of defamatory statements only to the one defamed does not constitute publication. *Vander Linden,* 197 Iowa at 537, 197 N.W. at 436. There are recognized exceptions to this rule when the wrongdoer knows or should know that the statements *must* eventually come to the attention of others. *See Colonial Stores, Inc. v. Barrett,* 73 Ga. App. 839, 38 S.E.2d 306, 308 (1946) (employee required by government regulation to disclose libelous statement on application for employment); *Bander v. Metropolitan Life Ins. Co.,* 313 Mass. 337, 47 N.E.2d 595, (1943) (defamatory statements in letter will likely come to the attention of a third party before the one defamed reads it).

The instruction given the jury correctly stated the law for cases like *Brown, Colonial Stores, Inc.,* and *Bander* but not for instances in which the injured party makes voluntary disclosure to others. We set the instruction out in full:

The term "publication" when used in connection with this case refers to the act of bringing the alleged utterance and publication to the knowledge or notice of

another person than the party alleged to have been damaged or was made under circumstances that the defendant knew or should have known that said utterances and publications would come to the attention of a third person.

The effect of this was to permit a finding that there had been a publication if Little "knew or should have known" Belchers would communicate his utterances to a third person. Other courts which have considered such cases have required something in addition, some urgent or pressing reason for disclosure.

In *McKinney v. County of Santa Clara*, 110 Cal.App.3d 787, 168 Cal.Rptr. 89 (1980), the court found a *strong compulsion* to disclose the defamatory statement to third parties; that this was reasonably foreseeable to the wrongdoer; and that such disclosures were actually made.

We quote from *McKinney*:

The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication. This causal link is no less strong where the foreseeable republication is made by the person defamed operating under a strong compulsion to republish the defamatory statement and the circumstances which create the strong compulsion are known to the originator of the defamatory statement at the time he communicates it to the person defamed.

*Id.* at 797–98, 168 Cal.Rptr. at 94.

Several federal courts have also considered this question. *See Carson v. Southern Railway Co.*, 494 F.Supp. 1104 (D.C.S.C. 1979) and *Church of Scientology of California, Inc. v. Green*, 354 F.Supp. 800 (S.D.N.Y. 1973). Both held a publication by the injured party did not impose liability on the one making the original statement. Although these cases did not articulate the reasons for the decision reached, there is language strongly suggesting the reasons are the same as the *McKinney* court announced.

The principle is clear. The defamed party has not suffered injury until someone other than himself learns of the defamation. The injured party cannot create his own cause of action by communicating the slanderous statements to others unless under strong compulsion to do so. What constitutes strong compulsion must of necessity be decided by the finder of fact under the circumstances in each case when substantial evidence of such compulsion is introduced.

Belchers argue they were under such compulsion here; and perhaps they were. The jury could have found there was compelling reason for Belchers to tell the bank why Little refused to sign a deed. On the other hand, the jury might also have decided the bank need not know *why* Little would not sign a deed, merely that he refused to do so. The trouble is this question was not submitted to the jury. Failure to do so was reversible error. On retrial the jury should be told to find a publication or absence thereof based on the disclosure of the defamation by Belchers to the bank; whether Belchers were under strong compulsion to make such disclosure; and whether Little should have reasonably anticipated such disclosure would be made.

For the reasons set out in Division II, the judgment is reversed and the case is remanded for a new trial.

REVERSED AND REMANDED.