Carole LEWIS, et al., Respondents,

v.

The EQUITABLE LIFE ASSURANCE
SOCIETY OF the UNITED
STATES, Appellant.

No. C8–84–1065.

Court of Appeals of Minnesota.

Jan. 22, 1985.

Review Granted March 29, 1985.

James W. Kenney, St. Paul, for respondents.

John R. Kenefick, St. Paul, Andrew W. Horstman, Minneapolis, for appellant.

Heard by LANSING, P.J., and HUSPENI and CRIPPEN, JJ.

Considered and decided en banc: POPOVICH, C.J., and PARKER, LANSING, HUSPENI, FORSBERG, RANDALL and CRIPPEN, JJ.

## OPINION

CRIPPEN, Judge.

Respondents, four former employees of appellant, brought suit against appellant for breach of an employment contract and defamation. The trial court jury found that an employee handbook was sufficient to create an employment contract, and that appellants violated this contract and defamed respondents by stating grounds of "gross insubordination" when terminating their employment. The jury assessed compensatory and punitive damages. The employer contends the verdict was not supported by sufficient evidence and was based on erroneous trial court instructions. We remand to exclude future damages for breach of contract, and we affirm on other issues.

## FACTS

Respondents, Carole Lewis, Mary Smith, Michelle Rafferty and Suzanne Loizeaux, are former employees of appellant, The Equitable Life Assurance Society of the United States. Respondents were hired by appellant between March and June of 1980, and were terminated in January 1981.

Respondents accepted positions as dental claims approvers. They did not execute written contracts of employment, but were employed pursuant to oral agreements for an indefinite period of time. Each was assured that her job was secure as long as her production stayed at a satisfactory level.

At the time of hiring, each employee received a personnel policy handbook entitled "You and the Equitable." Together with a statement of employee "responsibilities," the handbook points out:

The Equitable takes seriously its responsibilities for communicating and carrying out the personnel policies described in this book.

The Equitable handbook contains the following provisions on job terminations:

The Equitable seeks to ensure the job security of all salaried employees performing satisfactorily in essential positions.

\* \* \*

Dismissals usually come about because of an individual's indifference to work quality or attendance standards. Except for misconduct serious enough to warrant immediate dismissal, no employee will be discharged without previous warning and a period in which to bring performance up to a satisfactory level. When a dismissal is necessary and the employee has been with The Equitable for six months or longer, severance pay may be granted, depending on the reasons for the dismissal.

The production and performance of the four employees was satisfactory at all times.

In late 1980, the four respondents were sent to Equitable's Pittsburgh office to provide assistance in handling dental claims. They were briefed on expenses, but were neither given copies of Equitable's expense guidelines nor advised they would be required to file a written expense report.

Upon returning to St. Paul, the four employees were commended for their superior performance in Pittsburgh. At the same time, each employee was asked to reconstruct her expenses and submit an expense report. An Equitable manager indicated the completed reports were unacceptable. The manager asked each respondent to change items in the reports for maid tips, either by burying them in other categories or listing them on a separate sheet of paper. Each employee did as she was asked. However, Equitable refused to accept the changed reports. The management asked that the respondents again alter the reports to reflect lower totals. Then a memo was distributed explaining the "acceptable" amount for each category. Respondents decided to keep the expense reports as they were because they reflected the actual expenses incurred on the trip to Pittsburgh.

Neither at the time nor at trial did Equitable claim that any expenses listed by the employees were not incurred. Still, in January 1981, respondents received a letter from another member of the management team. This letter set out new guidelines and lower totals than the letter issued in November. The company again demanded that the employees alter the reports to reflect lower expenditures. The management prepared a revised expense report for one of the employees, Michelle Rafferty, with totals roughly $130 less than her original report. Rafferty did not sign the report because it did not honestly reflect her expenses.

An additional employee, Linda McBee, had also done work in the Pittsburgh office. Upon receipt of the January 1981 letter, McBee agreed to alter her expense report in order to keep her job. In addition to signing the revised report, she was forced to pay Equitable over $200, the difference between the expense advance and expenses listed on the revised report.

On January 23, 1981, an Equitable vice-president ordered that the four respondents be terminated for gross insubordination. The officer asked, however, that $50 be obtained from one respondent and $70 from another before they were told of the firing. The payments represented the excess of Pittsburgh expense advances over actual amounts the employees spent. The employees refunded the money as requested, and later the same day each was asked again to alter her expense report and then was terminated after deciding to stand on the accurate report.

Following their termination, the employees sought other positions of employment.

While filling out applications and interviewing, each of the respondents admitted (in response to inquiries) that her termination was for gross insubordination.

In August 1981, the employees commenced an action against Equitable for breach of an employment contract, wrongful termination and defamation. The trial court dismissed the tort claim of wrongful termination. A trial court jury found that Equitable had breached employment contracts, and defamed respondents. The jury assessed breach of contract damages of $22,100 for respondent Lewis, $43,000 for respondent Smith, $49,500 for respondent Rafferty, and $10,500 for respondent Loizeaux. Defamation damages of $75,000 were assessed for each respondent. In addition to compensatory damages, the jury awarded each respondent $150,000 punitive damages based on its finding of willfulness in appellant's defamation conduct.

This appeal is on denial of Equitable's motion for a new trial, or, alternatively, for judgment notwithstanding the verdict.

## ISSUES

1. Could the jury lawfully find that provisions of the Equitable employee handbook constituted a contract of employment?

2. Did the trial court err in instructing the jury that respondents' publication of a statement can form the basis for a defamation claim against Equitable?

3. Did the trial court err in instructing the jury that the truth of a statement should be measured by its actual implications?

4. Did the trial court err in its instructions to the jury regarding the qualified privilege of an employer in a defamation case?

5. Was the jury's award of compensatory and punitive damages supported by the evidence?

## ANALYSIS

1. Breach of contract.

According to the jury's verdict, Equitable entered into a contract of employment with each respondent and committed a breach of that contract in each of the four job terminations. Appellant contends its handbook did not preclude the firings.

For "any reason or no reason," an employer can discharge an employee who is hired for an indefinite term. *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 627 (Minn.1983). However:

[W]here an employment contract is for an indefinite duration, such indefiniteness by itself does not preclude handbook provisions on job security from being enforceable, whether they are proffered at the time of the original hiring or later, when the parties have agreed to be bound thereby.

*Id.* at 629–30. An agreement on job termination arises when employees accept an offer of particular terms that is "definite in form" and "communicated to the offeree." *Id.* at 626.

The trial court instructed the jury that handbook language might constitute an enforceable agreement. Reflecting controlling law, the court also instructed:

[A] promise of employment on particular terms of unspecified duration, if in the form of an offer and if accepted by the employee, may create a binding unilateral contract. The offer must be definite in form and must be communicated to the employee.

Here, as in *Pine River*, the handbook language was offered in a direct communication to each respondent. In its handbook, Equitable expressly charged itself with responsibility "for communicating and carrying out" the handbook policies.

The job termination language in Equitable's handbook was definite in form. In *Pine River*, the supreme court rejected as indefinite a declaration about "stable" employment, but the court found a definite offer in language permitting discharge only after oral and written reprimands followed by unimproved conduct. *Pine River*, 333 N.W.2d at 630. Here also the hand-

book policy prohibited discharge without unheeded warnings. In addition, the employer agreed that only serious misconduct could be a ground for immediate dismissal.

■ Appellant also contends one of the jury instructions on proof of a contract misled the jury about the claim of breach of the contract. The jury was told that a contract based on provisions of the employee handbook would arise only if Equitable intended to "give up its right to terminate the employment of its employees at will." Appellant asserts that the instruction prompted the jury to conclude Equitable could never fire an employee if a contract was proven. We disagree.

■ The challenged instruction was clearly among others on the existence of a contract. Other instructions adequately dealt with non-performance and breach of contract. The jury was given a written copy of instructions. Further, the instruction was not questioned at trial and cannot be successfully challenged on appeal. *Colby v. Gibbons*, 276 N.W.2d 170, 178 (Minn. 1979).

■ Equitable also objects to an instruction that employment agreements always include a covenant of good faith and fair dealing. The instruction conflicts with Minnesota law. *Eklund v. Vincent Brass and Aluminum Co.*, 351 N.W.2d 371, 378 (Minn.Ct.App.1984), *pet. for rev. denied*, (Minn. Nov. 1, 1984). However, this is also an objection which was not stated during the course of the trial, and it cannot be raised now. *Colby*, 276 N.W.2d at 178. Further, the instruction did not enlarge the duties of the employer as otherwise agreed in the employment contract.

2. Defamation claim.

■ To prevail in a defamation action, respondents must show that a statement was "false" and was communicated to someone other than the plaintiff. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn.1980). When made in good faith, an employer has the privilege

to describe the discharge of an employee. *Id.* at 257.

Decisions on each of these aspects of defamation law are contested here, and the appeal raises several issues of first impression in Minnesota. At issue, generally, is the breadth of the necessary freedom of employers to deal with discharge of employees, and we have cautiously examined a decision that appellant acted beyond the outer limits of that freedom.

a. Republication by the defamed party.

The jury's special verdict included a "yes" answer to this interrogatory:

Should defendant Equitable Life have foreseen that [the words "gross insubordination"] would be communicated (republished) by one or more of the plaintiffs to prospective employers?

The jury also found that each employee had communicated the words to a prospective employer.

These jury instructions of the trial judge depicted the law on republication by a plaintiff:

The originator of the defamatory statement is liable for damages caused by the republication if the disclosure of the contents of the defamatory statement by the person defamed is a natural and probable consequence of the originator's action.

In considering whether there has been a republication for which the defendant is liable, you should ask yourselves these questions:

First, was the person defamed operating under a strong compulsion to republish the defamatory statement?

Second, were the circumstances which created this strong compulsion known to the originator of the defamatory statement at the time he communicated it to the plaintiff?

■ Analysis of republication law begins with this settled proposition:

Ordinarily the defendant is not liable for any publication made to others by the plaintiff himself, even though it was to be expected that he might publish it.

Prosser and Keeton on the Law of Torts § 113 (5th ed. 1984). Appellant contends the trial court erred in applying a contrary rule of law.

 When an injured party operates under a strong compulsion to republish, and that compelled repetition is reasonably foreseeable, publication for defamation law purposes has occurred. *Belcher v. Little,* 315 N.W.2d 734, 738 (Iowa 1982); *McKinney v. County of Santa Clara,* 110 Cal. App.3d 787, 168 Cal.Rptr. 89 (1980). The rule applies a more general proposition: a defendant is responsible for republication he knows will occur. *See Grist v. Upjohn Company,* 16 Mich.App. 452, 168 N.W.2d 389 (1969); *Colonial Stores, Inc. v. Barrett,* 73 Ga.App. 839, 38 S.E.2d 306 (1946). As observed by the *McKinney* court, liability for defamation is a necessary consequence of the "strong causal link" between the making of a statement and compelled repetition. *McKinney,* 110 Cal.App.3d at 797–98, 168 Cal.Rptr. at 94. We have not discovered a jurisdiction which has addressed the situation of compelled republication and held differently.

 There was sufficient evidence here to support the verdict on republication. As had to be expected, respondents were confronted with inquiries about grounds for termination of their prior employment. They had the option to lie, but otherwise they were compelled to communicate the grounds given them by appellant. Although respondents were able to discuss the circumstances of their discharge, the defamation is not erased by opportunities for explaining or refuting it. Appellant's policy of refusing to discuss former employees with prospective employers makes even clearer the inevitable occurrence of publication by the employees.

The issue on republication law has primary importance in this case, and we recognize the impact of republication law on employers. At the same time, we see a peril only for employers whose communications demonstrate dishonesty and malice.

b. Measure of Truth.

The jury answered "no" to this interrogatory:

Were the words "gross insubordination" as applied to each of the plaintiffs substantially true?

The question excluded regard for the true fact that the bases for firings were accusations of insubordination. Jury instructions were consistent with the interrogatory:

To constitute justification by means of the plea of truth, such truth must extend to the truth of the publication in the sense of which it would be understood by persons of ordinary intelligence and comprehension who heard the alleged slanderous statement or read the alleged libelous statement, giving to the words used their ordinary and accepted meaning.

 The issue is this: Is truth measured according to literal meaning of a statement, or its ordinary implications? The Minnesota Supreme Court described this issue in *Johnson v. Dirkswager,* 315 N.W.2d 215, 218–19 (Minn.1982). The case presented facts similar to the case here, but it was decided on other grounds.

 We conclude in the circumstances of this case, the defamation was the characterization of the discharge. The statements here assert that gross insubordination did occur, causing the discharge of the employees. If a statement more obviously suggests an unproven accusation, a different result would follow.

We are convinced the trial court employed a useable and proper standard on truth, dwelling on what is ordinarily understood.

Because the supreme court has not recognized a cause of action for wrongful, bad faith termination of an employment contract, appellant contends a defamation claim must be decided without considering whether the dismissal was wrongful. *See Wild v. Rarig,* 302 Minn. 419, 234 N.W.2d 775 (1975). The logic of this argument is illusory. Cause for discharge is examined here due to evidence of malicious false

statements, not just bad faith. Similarly, with or without bad faith, cause for discharge might be reviewed in an action for breach of a relevant contract.

c. Qualified privilege.

The jury was instructed:

[A]n employer who communicates material about an employee to a prospective employer of that employee may have a qualified privilege attached to that material.

To render such statement qualifiedly privileged, * * * it must be made without actual malice, must be made in good faith and in an honest belief that it was true.

This instruction correctly depicts the law. Absent proof of actual malice, a plaintiff cannot recover for defamation of a protected kind. *Steumpges*, 297 N.W.2d at 256–57, *citing Hebner v. Great Northern Ry. Co.*, 78 Minn. 289, 292, 80 N.W. 1128, 1129 (1899).

Further, the jury responded "yes" to this interrogatory:

Was the use of the words "gross insubordination" actuated by actual malice?

The trial court defined actual malice for the jury:

Actual malice in a defamation action means that the defamatory statement was made from ill will and improper motive or causelessly and wantonly for the purpose of injuring the plaintiffs. You may find that the defendant, through its agents, was actuated by actual malice if it acted in bad faith toward the plaintiffs and with an intent to injure them in their reputations or if it acted in wilful, wanton, and reckless disregard of the rights and interests of the plaintiffs.

The court's statement of law on malice conforms almost exactly with declarations of the supreme court in *Steumpges*, 297 N.W.2d at 257, *citing McKenzie v. William J. Burns Int'l. Detective Agency, Inc.*, 149 Minn. 311, 312, 183 N.W. 516, 517 (1921). Whether a privilege has been abused is generally a question for the jury. *Steumpges*, 297 N.W.2d at 257.

Appellant contends the jury verdict on malice is insufficiently supported by evidence. We do not agree. A jury finding will be set aside only if it is "manifestly and palpably contrary to the evidence." *Carpenter v. Mattison*, 300 Minn. 273, 276, 219 N.W.2d 625, 629 (1974). The jury received extensive evidence to permit its finding of Equitable's indifference and bad faith in labeling the conduct of respondents.

Instructions of the trial court incorrectly stated that a qualified privilege is abused and lost when a communicator knows a statement is false or acts in reckless disregard as to truth or falsity of the statement. This was not reversible error. The instructions as a whole are clear about the need for proof of actual malice to defeat Equitable's qualified privilege. The instruction was not used in the definition of actual malice. The jury made a specific finding that Equitable's defamatory statement was "actuated by actual malice."

Finally, appellant argues the result here improperly erodes freedoms of employers to communicate with employees and other employers. Those communications are properly encouraged by a privilege that stands so long as malice is not proven, and the facts here properly led to a finding that the privilege was abused by Equitable.

3. Damages.

A jury award will not be set aside "unless it is manifestly and palpably contrary to the evidence." *Levienn v. Metropolitan Transit Commission*, 297 N.W.2d 272, 273 (Minn.1980).

a. Compensatory damages.

As appellant contends, the trial court erred in dealing with one segment of compensatory damages. The jury was told it could consider harm to the "future earning capacity" of each respondent. Damages for loss of earnings were permitted only on the claim of breach of contract, and

the court properly instructed the jury to avoid duplication of damages caused by both a breach of contract and defamation claim. The jury found compensatory damages for breach of contract totaling $125,-100 for the four respondents.

Following the verdict, the trial court suggested and approved dismissal of claims respondents had pleaded for expungement of defamatory records. Thus, respondents were permitted and encouraged to avoid mitigation of future loss of earnings. *See Lesmeister v. Dilly*, 330 N.W.2d 95, 103 (Minn.1983). Further, although the trial court observed that the verdict itself vindicated respondents, it nevertheless failed to eliminate an award of damages for future harm.

 We conclude the trial court must correct the awards of damages for breach of contract to exclude losses which are avoided by publication of the verdict, or can be avoided by expungement of defamatory statements at this time.

The awards of compensatory damages are otherwise supported by considerable evidence. Each employee testified regarding the difficulty in finding employment once she had been terminated by Equitable. This testimony was verified by expert descriptions of normal hiring practices.

Further evidence indicates that respondents would have been eligible for severance pay had they been discharged for grounds other than gross misconduct. An Equitable manual defines gross misconduct as:

> * * * a serious violation of accepted standards of behavior. Examples are: assaulting another employee, involvement in drug traffic, theft or destruction of Equitable's or another employee's property, or misusing an ID card. Gross misconduct also includes gross insubordination and falsification of any Equitable records, including employment papers.

The parties agree the reputations of respondents were damaged *per se* by the statement about gross insubordination. We find evidence adequate to support the jury's measure of damages for loss of reputation, standing in the community, and other humiliation or distress.

b. Punitive damages.

 An award of punitive damages will not be disturbed "unless it is so excessive as to be unreasonable." *Stuempges*, 297 N.W.2d at 259.

Equitable's willful indifference toward the employees' rights when defaming them is shown by competent evidence indicating a marked contrast between the conduct of the employees and the view of that conduct expressed by the employer.

The employees' performance was satisfactory at all times while working for Equitable. Indeed, they received personal letters of commendation for their performance while in Pittsburgh. The sole accusation of insubordination was the refusal to alter expense reports.

Respondents were not informed of Equitable's expense report policy prior to leaving for Pittsburgh. A management level employee admitted to one of the respondents that the expense dispute was his fault due to a failure to adequately brief respondents. Nonetheless, the employees were repeatedly asked to alter their expense reports, and were given different guidelines to follow on several occasions. When first requested, each employee revised her report to fit within guidelines set by Equitable. Each of the other requests, however, required that respondents alter the reports by excluding expenses actually incurred, and that they subsequently pay the excluded amount to appellant. Appellant has never argued that respondents claimed false expenses, or even that the expenses claimed are not in keeping with the expense instructions given them prior to their trip, yet Equitable persistently repeated demands that the employees alter their reports.

Ultimately, an Equitable vice-president saw fit to exact a total of $120 from two employees by withholding word that they would be fired later the same day. To save her job, another Equitable employee, situ-

ated similarly to respondents, was forced to alter her expense report to reflect inaccurate expenditures and to pay Equitable the $200 difference between her actual expenses and the amount shown on the revised report.

 . Given the evidence presented to the jury, we conclude the punitive damage award, though unusually large, is not "so excessive as to be unreasonable." *Id.*

· 4. We have examined additional contentions of error in trial court instructions and in an evidentiary ruling, and we conclude that the points have no merit.

### DECISION

The verdict on breach of contract and defamation was rendered without reversible error of the trial judge or the jury. First impression issues of law were correctly decided. Except as to awards for future harm, damages were lawfully determined. We remand and instruct the trial court to reduce breach of contract damages to conform with this opinion.

Affirmed in part and remanded in part.

FORSBERG and RANDALL, JJ., dissent.

FORSBERG, Judge, dissenting:

The majority opinion, recognizing that it is making new law in Minnesota, adopts the doctrine of self-publication in defamation actions against former employers. This doctrine, as adopted here, would greatly increase employer liability, fundamentally ignoring the principle of mitigation of damages and recognizing, in thin disguise, the tort of wrongful termination rejected by our supreme court in *Wild v. Rarig*, 302 Minn. 419, 234 N.W.2d 775 (1975). Accordingly, I would reverse the trial court on respondents' defamation claim.

Standard employment application forms, as well as nearly all employment interviewers, uniformly require information on past employment, almost always including reasons for termination of past employment. All employers can be held accountable for knowledge of this practice. Therefore,

there is in virtually all cases of employee discharge a strong compulsion to republish, foreseeable to the employer. Since any statement adversely affecting an employee in his business or profession is defamatory per se, *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252 (Minn.1980), and all terminations for employee conduct or performance have this potential, all such terminations may give rise to a defamation action.

In light of *Wild v. Rarig*, I would reserve to the supreme court the making of new law on this subject. It is to be noted that California, the jurisdiction cited by the majority for its acceptance of the doctrine of "self-publication" in *McKinney*, has recognized a tort of wrongful termination. *Tameny v. Atlantic Richfield Co.*, 164 Cal. Rptr. 839, 610 P.2d 1330 (1980).

The doctrine of self-publication inherently slights the important principle of mitigation of damages, particularly in the law of defamation. The Supreme Court has stated:

> The first remedy of any victim of defamation is self-help—using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974). The terminated employee has the best conceivable opportunity to lessen the damage caused by his reason for discharge, since he or she may accompany the statement with an explanation.

If the doctrine of self-publication is to be adopted, it should be limited to compelling fact situations, to avoid making a defamation case of every termination. In some cases, such as a charge of embezzlement or employee theft, there may be a strong compulsion to republish the charge without a real opportunity for explanation. In general, however, an employee is only obligated to state the true reason for his termination. *Cf., Strouth v. Wilkison*, 302 Minn. 297, 224 N.W.2d 511 (1974) (contractor who had withdrawn from construction business due to bankruptcy misrepresented the reason

as ill health). It is apparent that the further from the truth the former employer's allegation is, the less the employee is under a duty to "republish" it in a damaging form. In this case, a less damaging characterization than "gross insubordination" would have been fully justified.

If such a doctrine is adopted, the employer should enjoy the qualified privilege recognized by law, whether he communicates with other employers or only with the employee. Because of erroneous instructions in this case, it is doubtful that Equitable received the benefit of its qualified privilege to report the reasons for its discharge of employees.

The trial court erred in submitting the issue of qualified privilege to the jury:

> Whether the occasion was a privileged one is a question to be determined by the court as an issue of law, unless of course the facts are in dispute, in which case the jury will be instructed as to the proper rules to apply.

*Prosser and Keeton on the Law of Torts,* § 115 (5th ed. 1984); *see also,* Restatement of Torts 2d § 619.

There was no dispute here as to the facts of the communication. The jury's function, therefore, was only to determine whether the privilege had been abused, by a showing of actual malice. The trial court, however, instructed the jury that it could find malice either on the basis of "ill will and improper motives," *Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 257 (Minn. 1980), or based on reckless disregard for the truth or falsity of the statement. *Id.* As the majority acknowledges, this was contrary to the holding in *Stuempges* that the second standard should not be used against non-media defendants:

> Thus, [the *N.Y. Times* standard's] focus on the defendant's *attitude toward the truth* of what he had said rather than on his *attitude toward the plaintiff* is proper only when a media defendant is involved.

297 N.W.2d at 258 (emphasis in original).

Although the jury could still have found actual malice based on the first standard, by allowing the jury to focus on Equitable's attitude towards the truth of its grounds for termination, the court permitted the jury to find defamation liability merely for wrongful termination. I do not agree that these were harmless errors.

For the reasons stated above, I would reverse the trial court on the defamation claim. Respondents have established no more than a breach of their employment contract, for which punitive damages is not available.

RANDALL, Judge, dissenting.

I join in the dissent of Judge Forsberg.