# IN THE COURT OF APPEALS OF IOWA

No. 21-1014
Filed July 20, 2022

**WILLIAM L. BALLOU and LINDA L. BALLOU, Individually and as Trustees of the BALLOU FAMILY REVOCABLE TRUST u/d/o August 15, 2012, KATHRYN BENSON, LORILEE ANDREINI and THE MILLER FARM PARTNERSHIP,**
    Plaintiffs-Appellees,

**vs.**

**LEE P. KURTENBACH,**
    Defendant-Appellant.

_____

        Appeal from the Iowa District Court for Cedar County, Thomas G. Reidel

(summary judgment) and Jeffrey D. Bert (attorney fees), Judges.

        A farm tenant appeals the grant of summary judgment on his slander of title

and related claims and the attorney-fee award to the landowner. **AFFIRMED AND**

**REMANDED.**

        Peter C. Riley of Tom Riley Law Firm, P.L.C., Cedar Rapids, for appellant.

        Karl M. Sigwarth and Jeremiah D. Junker of Bradley & Riley PC, Cedar

Rapids, for appellees.

        Considered by Tabor, P.J., and Greer and Ahlers, JJ.

**TABOR, Presiding Judge.**

Appellate courts often say summary judgment is not a dress rehearsal for trial.[1]  Building on that analogy, landowners William and Linda Ballou quip that Lee Kurtenbach's case is "barely even a table-read."   Turning to the storyline, Kurtenbach contracted with the Ballous to rent their farmland.  They sued for breach.  He counterclaimed, alleging they engaged in tortious conduct.  The district court entered summary judgment for the Ballous.   Kurtenbach appeals the dismissal of his counterclaim and contests an attorney-fee award.

We agree with the Ballous on the weakness of Kurtenbach's counterclaim. Kurtenbach failed to present triable issues on his allegations of tortious conduct. So the district court properly decided the Ballous were entitled to judgment as a matter of law.  We also affirm the award of trial attorney fees under the lease agreement.  And we award reasonable appellate attorney fees, remanding for the district court to determine the amount.

## I.  FACTS AND PRIOR PROCEEDINGS

In fall 2015, Kurtenbach rented two farms, totaling 388.4 acres, from the Ballous.[2]  They entered two leases, each for a one-year term starting in March

---

[1] Rather, it marks "the put up or shut up moment in a lawsuit, when a [nonmoving] party must show what evidence it has that would convince a trier of fact to accept its version of the events."  *Slaughter v. Des Moines Univ. Coll. of Osteopathic Med.*, 925 N.W.2d 793, 808 (Iowa 2019) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)).

[2] The first property is owned by the Ballou Revocable Trust; the trustees are William and Linda Ballou.  The trust also owns two thirds of a second property. The remaining third of the second property is owned by Kathryn Benson and Lorilee Andreini.  Together the owners of the second property form the Miller Farm Partnership.  We will refer to these landowners collectively as the Ballous.

2016.[3]  Those leases renewed each year unless terminated.  If Kurtenbach defaulted on rent, the agreement gave a security interest or lien to the Ballous in "all growing or mature crops" on the real estate.

Kurtenbach fell behind in his payments by January 2017.  Another payment was due March 2017.  Despite Kurtenbach being in arrears, the Ballous did not move to terminate the lease right away.  During that reprieve, Kurtenbach tried to obtain financing for rent and farm operations but nothing came together.  The parties tried to negotiate a deal so Kurtenbach could continue farming the land.  Again, it did not work out.[4]

In January 2018, the Ballous filed a Uniform Commercial Code (UCC) Financing Statement with the Iowa Secretary of State noting an agricultural lien on Kurtenbach's crops.  Then the Ballous moved to terminate the lease.[5]  Kurtenbach ended up farming the Ballous' land only in 2016 and 2017.

In February 2019, the Ballous sued Kurtenbach alleging breach of contract, promissory estoppel, unjust enrichment, and fraudulent misrepresentation.  Kurtenbach raised the affirmative defense that the Ballous breached the contract to extend him credit.  And he counterclaimed, alleging breach of that secondary contract, conversion, fraudulent misrepresentation, and punitive damages.

---

[3] As relevant here, those leases have identical terms.

[4] Kurtenbach's brother, Joel, recalled an offer to secure the Ballous' credit line with an eighty-acre property that Lee owned free and clear and to guarantee payment of the "milk assignment" from his dairy operation.  But the Ballous declined because of "the capital gains taxes, and [their] attorneys didn't like the deal."

[5] Section 17 of the lease required the Ballous to serve notice of default, and gave Kurtenbach thirty days to cure.  Failure to cure terminated the lease.  The Ballous served Kurtenbach on March 26, so the lease terminated April 25, 2018.

The Ballous sought summary judgment on their breach-of-contract claim and on Kurtenbach's breach-of-contract and fraudulent-misrepresentation counterclaims. In spring 2020, Kurtenbach amended his counterclaims to include a fifth count for "tortious conduct" encompassing "interference with existing and prospective contractual relationships, slander of title[,] and defamation." That claim was based on the UCC financing statement. Kurtenbach alleged the financing statement made it appear that the lien was on crops harvested after he stopped farming the leased land, which prevented him from obtaining financing for his 2020 farming operations. He also alleged the Ballous had refused to terminate or amend the statement to clarify that it does not cover crops after 2017.

The district court granted the Ballous' motion for summary judgment on their breach-of-contract claim, finding Kurtenbach owed them $137,281.50 in missed rent, plus interest. And it dismissed the counterclaims for breach of contract and fraudulent misrepresentation. Kurtenbach then withdrew his conversion claim.

The Ballous next sought summary judgment on Kurtenbach's remaining counterclaim for punitive damages, as well as the amended count of tortious conduct. After a hearing in April 2021, the court granted the motion, dismissing the remaining counterclaims. Kurtenbach moved to enlarge the order, but the court denied that motion. A few weeks later, the Ballous sought an award of $59,379.38 in attorney fees. The court approved a slightly lower award, $55,472.68.

Kurtenbach appealed the second summary judgment order and the attorney-fee award. The supreme court consolidated those appeals and transferred the case to us.

## II. SCOPE AND STANDARDS OF REVIEW

We review summary judgment orders for correction of legal error. *Morris v. Legends Fieldhouse Bar and Grill, LLC*, 958 N.W.2d 817 (Iowa 2021). "Summary judgment is appropriate only when the record shows no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Hedlund v. State*, 930 N.W.2d 707, 715 (Iowa 2019); *see also* Iowa R. Civ. P. 1.981(3) (requiring court to consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" when deciding motion for summary judgment). "A genuine issue of fact exists if reasonable minds can differ on how an issue should be resolved." *Banwart v. 50th St. Sports, L.L.C.*, 910 N.W.2d 540, 544 (Iowa 2018) (citation omitted). And "[a] fact is material when it might affect the outcome of a lawsuit." *Id.* Kurtenbach, as the opponent of summary judgment, may not rest on the allegations in his pleading but must lift up specific facts showing the existence of a genuine issue for trial. *See Hlubek v. Pelecky*, 701 N.W.2d 93, 95 (Iowa 2005). We view the evidence in the light most favorable to Kurtenbach. *See Banwart*, 910 N.W.2d at 545. And we accept every legitimate inference we can reasonably draw from the record. *Hedlund*, 930 N.W.2d at 715. But "speculation is insufficient to generate a genuine issue of fact." *Hlubek*, 701 N.W.2d at 98.

Likewise, we review the district court's contract interpretation for correction of legal error. *Colwell v. MCNA Ins. Co.*, 960 N.W.2d 675, 676–77 (Iowa 2021). The "cardinal rule" of contract interpretation is to determine the intent of the parties when they formed the contract. *Pillsbury Co., Inc. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008). True, the contract's language "remain[s] the most important

evidence of intention." *Id.* But the meaning of those words "can almost never be plain except in a context." *Id.* (quoting Restatement (Second) of Contracts § 212 cmt. b (Am. Law. Inst. 1979)). So we examine the contract language in context to assess the district court's ruling.

## III. Analysis

### A. Summary Judgment on Counterclaims

Kurtenbach contends that he produced enough evidence to generate a jury question on his tortious conduct count, which encompassed claims of slander of title, defamation, and interference with existing and prospective contracts. So, he argues, the district court erred in granting summary judgment on those counterclaims.

Stepping back a moment, section 16 of the lease gives the Ballous "a security interest in, but not limited to, all growing or mature crops on the Real Estate, as provided in the Iowa Uniform Commercial Code." In their UCC financing statement, the Ballous noted the collateral on the lien was "$155,000 worth of soybeans, and earlage[6] in white bags all stored at debtor's residence." The financing statement also said, "Debtor (Tenant) grants to Creditors (Landlords) a security interest in the crops raised on the leased land owned by Creditors."

---

[6] Our record does not define "earlage," but the parties' filings discuss corn "chopped into earlage." Other sources describe earlage as "a form of silage that does not use the corn stalks or leaves." *See Plaintiff's Resistance to Defendant's Motion for Summary Judgment, Ashley Farm Partnership d/b/a Ashley Acres Family Limited Partnership and Tony Ashley, Plaintiffs, v. Farmers Mutual Insurance Association, Defendant*, No. LACV186010, 2019 WL 5309975 (Iowa Dist. Ct. for Woodbury Cnty. June 7, 2019); *see also United States v. Frye*, No. W181047/NE17, 1996 WL 539209, at *1 (D. Neb. June 14, 1996) (describing earlage as ground corn and cobs).

In the district court, Kurtenbach made these allegations to support his tortious conduct claims:

> . . . The Financing Statement alleges that there is collateral stored on Lee P. Kurtenbach's residence, which is false and has no basis in fact.
> . . . The UCC filing is also deficient in that it is general and not specific as to what years' crops are covered.
> . . . The UCC filing [has] interfered with Lee P. Kurtenbach's ability to obtain financing for 2020 farming operations.
> . . . Demand has been made on counsel for the Plaintiffs that the UCC filing be released, or at least amended to show it does not cover crops after 2017.
> . . . Plaintiffs have refused to terminate or amend their Financing Statement.

In his supporting affidavit, Kurtenbach gave the following account of his financial struggles:

> The effects of the COVID-19 pandemic led to school closures, which decreased milk demand. In approximately March or April, 2020, the creamery would no longer take my milk. I was forced to sell my dairy herd. While I was aware at some point in time a UCC Financing Statement had been filed on behalf of [the] Ballous, it didn't really affect my farming operation until I tried to obtain financing for my 2019 crop. I went to a company called Ag Resources Management (ARM) in 2019 for crop financing and was told they could not provide financing because there was a UCC filing against me. Because I was milking until the spring of 2020, I was able to finance my 2018 and 2019 crop year inputs from the net proceeds of the milk checks I would receive. I didn't have proceeds from milk checks in the spring of 2020, so I was not able to finance my 2020 crop from milk checks.

Kurtenbach then discussed his efforts to have the Ballous amend their UCC filing.

> I went back to ARM in the spring of 2020. I was told they could not finance me as long as there was a UCC filing that might affect 2020 crops. At my request, my attorney made demands on the Ballous' counsel in May of 2020, to release the UCC filing since the crops identified in the filing, the soybeans and earlage allegedly stored at my residence, did not exist. In the alternative, I then demanded that they amend their UCC filing and limit it to crops in

2017 since I did not raise any crops on any Ballou farms after 2017, and Ballous would not have any basis for any security interest on crops raised after 2017. The emails between counsel show [the] Ballous refused to limit their UCC so it would be clear there would be no lien on crops grown after 2017. My attorney then filed to amend my Counterclaim against [the] Ballous to include their refusal to release or amend their UCC filing.

He then blamed the Ballous for his scaled-back farming operation.

If the Ballous had amended the UCC Financing Statement to make clear it would not apply to any crops after 2017, ARM would have been able to provide input financing to me. Because they didn't, I was only able to plant corn and soybeans on 180 acres based on what I could finance with the cash I had on hand. If I had been able to obtain input financing, I would have planted corn and soybeans on a total of approximately 700 acres. I only planted 135 acres of corn and 45 acres of beans. The remaining ground remained in pasture, which I no longer needed since I no longer had a dairy herd.

The referenced correspondence about amending or withdrawing the UCC filing began on May 13, 2020. Kurtenbach's attorney, Peter Riley, emailed the Ballous' attorney, Jeremiah Junker, demanding they withdraw the financing statement, reasoning "the identified collateral never existed." On May 19, Junker replied:

> The collateral identified in the financing statement was soybeans and earlage harvested from the leased property, addressed and secured in paragraph 16 of the leases. . . .
> I spoke with our clients re: the financing statement, and at present they are not inclined to release the statement. If you believe there is any additional information our clients should consider, please let me know.

The same day, Riley replied:

> The existence of this false Financing Statement has been a problem for Lee Kurtenbach, but is particularly significant right now, as it is interfering with his inability to consummate input financing for 2020. Since 2017 would have been the last year that Lee Kurtenbach produced any crops on farms owned by Ballou interests,

there can be no dispute that there would be no right to any kind of a lien on any property after 2017.

While my client demands that the false lien be immediately terminated, at a minimum, and to avoid damage to my client, please have the Ballous immediately file an amendment to their Financing Statement making clear that there is no claim for any crop after the 2017 crop year.

Two days later, Kurtenbach amended his counterclaim to allege tortious conduct.

And to demonstrate his thwarted attempts to obtain a loan for 2020 inputs, Kurtenbach submitted a blank loan application from lender ARM and some correspondence with one of their officers. The blank application requires the borrower to submit, among other information, a financial statement, a list of all current agricultural leases, and a list of all third-party creditors. It also asks the borrower to agree or disagree with the statement "I have no outstanding liens on the crops involved in this loan." A May 18, 2020 email from ARM's area manager Donna Swanson to Kurtenbach says, "Attached are the 2 UCC filings we discussed."[7] Kurtenbach's affidavit is the only record of their discussion.

### 1. Slander of Title

Kurtenbach focuses first on his slander-of-title counterclaim, so we begin there. He claims the UCC financing statement did not specify the crop years and appeared to create liens on his 2020 crops, leaving lenders unwilling to finance his farming operations.

---

[7] On March 13, 2017, AdVantage FS, a division of Growmark, Inc., also filed a UCC financing statement describing Kurtenbach's outstanding debts. But AdVantage agreed to subordinate its interest around the time Kurtenbach asked the Ballous to amend or withdraw their statement. Swanson's email reveals that Kurtenbach's trouble obtaining credit related to both UCC statements, not the Ballous' statement alone.

Slander of title requires showing: "(1) an uttering and publication of slanderous words; (2) falsity of those words; (3) malice; (4) special damages to the plaintiffs; and (5) an estate or interest of the plaintiff in the property slandered." *Brown v. Nevins*, 499 N.W.2d 736, 738 (Iowa Ct. App.1993). The district court found no evidence of a false statement, digging into the Ballous' filing:

> [T]he UCC statement does not make any assertion regarding 2020 crops. In the miscellaneous section of the UCC, it states, "Debtor (tenant) grants to the creditors (landlords) a security interest in the crops raised on the leased land owned by creditors." Kurtenbach's lease with Plaintiffs ended on April 25, 2018, and there is no evidence that he grew crops on the property in 2018, 2019 or 2020. To the contrary, the evidence established he did not grow crops on Plaintiffs' properties during those years. As Kurtenbach did not raise any crops on Plaintiffs' property during 2020, the UCC statement is not making any assertions as to the 2020 crops and, thus, no false assertion is made.

In the context of disparaging real estate titles, slander may come as either written or oral statements. *Belcher v. Little*, 315 N.W.2d 734, 736 (Iowa 1982). Section 16 of the lease gave the Ballous a security interest in "all growing or mature crops." And the UCC statement mirrored that language by explaining the Ballous had a "security interest in the crops raised on the leased land." Although it does not list years, at the time of filing, the lease had not yet terminated. Still, the language is not false. Nor is it vague as to duration—the only crops the Ballous took an interest in were those "raised on the leased land," and the lease ended before the 2018 crop year. Kurtenbach stated in interrogatories that he was aware of the statement in 2018. By 2020, he knew the lease ended after the 2017 crop year, information he could have provided to the lenders. Indeed, when asked in the loan application, he could have declared that no liens existed on his 2020 crop. But he has not shown that he did so because the loan applications he submitted are blank. Like

the district court, we find no genuine issue of material fact on the falsity element of Kurtenbach's slander-of-title claim.

In addition, the district court found there was no genuine issue of material fact on the malice element. "A malicious act is . . . deliberate conduct without probable cause" suggesting "an intention to vex, injure, or annoy." *Davitt v. Smart*, 449 N.W.2d 378, 380 (Iowa 1989). Kurtenbach did not produce any evidence that the Ballous acted deliberately without good cause in filing the statement. Although he asserts the Ballous maliciously refused to amend the statement, the email record sounds a different note. The Ballous were not inclined to amend their filing, believing that the lien accurately reflected their security interest in the stored crops. But the Ballous' counsel asked Kurtenbach's counsel to inform him if there was more information to consider. Two days later, Kurtenbach filed these counterclaims. Even if the Ballous were wrong in filing the lien on those specific crops, Kurtenbach produced nothing to show they acted with deliberate knowledge of the statement's falsity or with malice.[8] So we find no error in the district court's ruling on that element.

To provide another point, in pursuit of special damages Kurtenbach must show the slanderous statement caused his injuries. But the district court found the evidence supporting causation was deficient, and we agree. When asked to

---

[8] Another fact highlights the weakness in Kurtenbach's allegations of malice. In his interrogatory response he admitted knowing of the UCC filing in 2018 and choosing not to apply for a crop loan that year because of it. Instead, he financed his crop with milk checks. But then "the pandemic in 2020 devastated the dairy market" because "[t]he closing of schools across the country devastated the demand for dairy products." Now needing a crop loan, Kurtenbach asked the Ballous to withdraw the statement just a few weeks before alleging their malicious refusal.

"[i]dentify and describe any and all financing . . . you allege you would have been approved for but-for the UCC Statement," Kurtenbach's response was: "Any terms and conditions in connection with the financing from Ag Resources are shown on the attachments to these interrogatories." The attachments are the blank loan applications. Although Kurtenbach said in his affidavit that he "was told [ARM] could not finance [him] as long as there was a UCC filing that might affect 2020 crops," he has provided no other evidence of that. His email correspondence with the ARM loan officers references the UCC filing. But that's all. Nothing verifies that the officers would have granted the application but for the UCC filing. The correspondence shows only that a loan officer sent him an application. The blank applications do not show what information he submitted for the lender's approval. He provided no affidavits from the loan officers. And Swanson's email sheds little light on the process. As the district court found, "Kurtenbach is not a lender and is not competent to provide testimony regarding whether a lender would or would not have approved him as a result of the UCC financing statement. Kurtenbach's testimony that the UCC Financing Statement prohibited him from obtaining a loan is speculative at best."

One more question. Is Kurtenbach's affidavit that he "was told" by ARM that it "could not finance" him enough to generate a fact question that he applied for a loan and was rejected based on the UCC financing statement? We don't think so. Iowa Rule of Civil Procedure 1.981(5) sets out the criteria for affidavits in summary judgment proceedings. Supporting or opposing affidavits must "be made on personal knowledge" and must "set forth such facts as would be admissible in evidence." Iowa R. Civ. P. 1.981(5). They also must "show affirmatively that the

affiant is competent to testify to the matters stated" within the affidavit. *Id.* True, the existence of a loan application may be within Kurtenbach's personal knowledge. But he provided no evidence that he applied for a loan. He was in touch with loan officers but their emails did not show the UCC statement was the sticking point for his loan. In total, Kurtenbach did not set forth specific, nonspeculative facts beyond the allegations of his pleadings that could lead the fact finder to conclude the Ballous' financing statement prevented him from obtaining a loan for the 2020 crop year. *See Hlubek*, 701 N.W.2d at 95–96.

### 2. Defamation

Next, we turn to the defamation claim. "To establish a prima facie case in any defamat[ion] action, a plaintiff must show the defendant (1) published a statement that was (2) defamatory (3) of and concerning the plaintiff." *Andrew v. Hamilton Cnty. Pub. Hosp.*, 960 N.W.2d 481, 489 (Iowa 2021) (alteration in original) (citation omitted). A statement is defamatory if it is a "false statement[] of fact which tend[s] to harm an individual's reputation." *Bauer v. Brinkman*, 958 N.W.2d 194, 198 (Iowa 2021).

The district court again found no proof for the falsity element because the financing statement was clear that it did not apply to Kurtenbach's 2020 crop year. As with the slander-of-title claim, the evidence presented generates no genuine issue of material fact on whether the financing statement was false.

### 3. Interference with Contract

Next, interference with an existing contract requires proof "(1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference

caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted." *Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651 (Iowa 2008) (quoting *Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234, 243 (Iowa 2006)). As reasoned above, the undisputed evidence does not show the existence of any loan application or Kurtenbach's agreement with ARM or another lender. The district court reached the same conclusion and we find no error in it.

Similarly, interference with a prospective contract requires: "1. A prospective contractual or business relationship; 2. the defendant knew of the prospective relationship; 3. the defendant intentionally and improperly interfered with the relationship; 4. the defendant's interference caused the relationship to fail to materialize; and 5. the amount of resulting damages." *Blumenthal Inv. Trs. v. City of W. Des Moines*, 636 N.W.2d 255, 269 (Iowa 2001) (citation omitted). Here again, the district court found the UCC statement made no claim on the 2020 crop year, only the leased years. So it could not have interfered with Kurtenbach's loan application, even if he had proven its existence. And the district court determined that nothing from the lender confirmed that Kurtenbach would have been approved for a loan but for the lien. We again find no error in that determination.

### 4. *Punitive Damages*

Finally, the punitive damages allegation is based on tortious conduct, so no genuine issue of material fact exists as to that claim. In sum, we find no error in the court's application of the law to the undisputed facts. There is no genuine issue of material fact on Kurtenbach's tortious conduct or punitive damages claims, and

the district court did not err when it found the Ballous were entitled to judgment as a matter of law. We affirm dismissal of Kurtenbach's remaining counterclaims.

## B. Trial and Appellate Attorney Fees

Next, Kurtenbach challenges the district court's award of attorney fees to the Ballous. "Generally, attorney fees are recoverable only by statute or under a contract." *Goche v. WMG, L.C.*, 970 N.W.2d 860, 863 (Iowa 2022) (citation omitted). "When judgment is recovered upon a written contract containing an agreement to pay an attorney fee, the court shall allow and tax as a part of the costs a reasonable attorney fee to be determined by the court." Iowa Code § 625.22(1) (2020). We review an award of attorney fees for abuse of discretion. *Homeland Energy Sols., LLC v. Retterath*, 938 N.W.2d 664, 684 (Iowa 2020), *reh'g denied* (Feb. 26, 2020). "An abuse of discretion occurs when the court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Eisenhauer ex rel. T.D. v. Henry Cnty. Health Ctr.*, 935 N.W.2d 1, 9 (Iowa 2019) (cleaned up).

The leases provide, "If the lease terminates because the Operator failed to pay the rent due, all costs and attorney fees of the Owner to enforce collection or performance shall be added to the obligations payable by the Operator." Under that provision, the district court awarded $55,472.68 in attorney fees to the Ballous. Kurtenbach asserts that award included fees to litigate his counterclaims, which he argues the lease does not authorize. The district court found the counterclaims were intended "to defeat" the Ballous' claims so their fees to defend against those counterclaims were indeed incurred to "enforce collection" under the lease.

Our interpretation is much the same. The lease language does not exclude fees for defending against counterclaims so long as the costs are "to enforce collection or performance" on the contract. *See Palo Sav. Bank v. Sparrgrove*, No. 02–1234, 2004 WL 57466, at *3 (Iowa Ct. App. Jan. 14, 2004) (finding attorney fee provision in contact applied to counterclaims); *see also Fed. Land Bank of Omaha v. Woods,* 480 N.W.2d 61, 66 (Iowa 1992). The breach-of-contract, conversion, and fraudulent-misrepresentation counterclaims involved efforts to negotiate a deal with the Ballous that would allow Kurtenbach to keep farming their land. The added tortious-conduct counterclaim alleged Kurtenbach suffered harm from the Ballous' action to secure the collateral to enforce their contract. Thus, both sets of counterclaims fell within the Ballous' enforcement efforts under the lease. The lease instructs that the court "shall" add "all costs and attorney fees" associated with those efforts to the lessor's other obligations. The district court properly found that the lease language applied to fees incurred defending against the counterclaims.

The Ballous also request appellate attorney fees. When a party is eligible for trial attorney fees under section 625.22, an award of appellate attorney fees may follow. *Bankers Tr. v. Woltz*, 326 N.W.2d 274, 278 (Iowa 1982). In general, the district court is in a better position to determine a reasonable amount of attorney fees. *Id.* So we remand this case for that determination. *See* Iowa Code § 625.22.

**AFFIRMED AND REMANDED.**